PRESENT: Hassell, C.J., Lacy, Koontz, Kinser, Lemons, and Agee, JJ., and Compton, S.J.

ANTHONY BERNARD JUNIPER

OPINION BY
v.    Record Nos. 051423 and 051424    JUSTICE G. STEVEN AGEE
March 3, 2006

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Everett A. Martin, Jr., Judge

In these consolidated appeals, we consider the four capital murder convictions and death sentences imposed upon Anthony Bernard Juniper by the Circuit Court of the City of Norfolk, along with his convictions for statutory burglary and use of a firearm during the commission of a felony.

In the first stage of a bifurcated trial conducted under Code § 19.2-264.3, a jury convicted Juniper of capital murder for each of the four killings, statutory burglary while armed with a deadly weapon, and four counts of use of a firearm in the commission of a felony. In the penalty phase of the trial the jury "found unanimously and beyond a reasonable doubt" that Juniper "would commit criminal acts of violence that would constitute a continuing serious threat to society" and that his conduct in committing the offenses involved either "depravity of mind and/or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder."[1] The jury fixed

---

[1] The jury found both depravity of mind and aggravated battery in three of the murders (Keshia Stephens, Rueben

Juniper's punishment at death for each capital murder conviction, life imprisonment for statutory burglary while armed with a deadly weapon, and one three-year and three five-year terms for the convictions for use of a firearm in the commission of a felony. After reviewing the post-sentence report required by Code § 19.2-264.5, the trial court sentenced Juniper in accordance with the jury verdicts.

Juniper appealed his convictions for the crimes other than capital murder to the Court of Appeals. We certified that appeal (Record No.051424) to this Court under the provisions of Code § 17.1-409 for consolidation with the appeal of Juniper's capital murder convictions (Record No. 051423) and the review of his death sentence mandated by Code § 17.1-313(A).

After consideration of Juniper's assignments of error, the record, the arguments of counsel, and the review required by Code § 17.1-313, we find no error in the judgment of the trial court and will affirm that judgment, including the sentences of death.

I. FACTS AND MATERIAL PROCEEDINGS BELOW

Under well-settled principles of appellate review, we consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party in the trial

Harrison, III, and Shearyia Stephens), but only depravity of mind in the fourth murder (Nykia Stephens).

court.[2]  Burns v. Commonwealth, 261 Va. 307, 313, 541 S.E.2d 872, 877, cert. denied, 534 U.S. 1043 (2001); see also Lovitt v. Commonwealth, 260 Va. 497, 502, 537 S.E.2d 866, 870 (2000), cert. denied, 534 U.S. 815 (2001).

## A.   GUILT PHASE

On the afternoon of January 16, 2004, Keshia Stephens, her younger brother Rueben Harrison, III,[3] and two of Keshia's daughters, Nykia Stephens and Shearyia Stephens,[4] were killed in Keshia's apartment in the City of Norfolk.  When police arrived, they found that the door to Keshia's apartment had been forcibly opened.  All four victims were discovered in the master bedroom; each had died as a result of gunshot wounds.

Keshia was stabbed through her abdomen, shot three times, and grazed by a fourth bullet.  One bullet went through her intestine, kidney, and spine, causing spinal shock and leg paralysis.  Another bullet also passed through her intestines and then proceeded to her abdominal aorta and inferior vena cava, causing extensive bleeding.

The stab wound did not fatally wound Keshia, but tore through the muscle of her abdominal wall.  There was a great

---

[2] Juniper did not present any evidence during the guilt phase of the trial, with the result that all of the evidence came from the Commonwealth's witnesses.

[3] The record contains several different spellings of Rueben Harrison, III's first name.  We will spell his name "Rueben," consistent with the indictment.

deal of blood accompanying the wound, however, which led the medical examiner performing the autopsy to conclude that the stab wound was probably the first injury inflicted on Keshia. The stab wound was consistent with a wound that would have been caused by the knife blade found at the scene of the crime.

Two-year old Shearyia was shot four times while in her mother's arms. Two bullets entered Shearyia's body in the shin of her left leg, fractured the bone, and exited through her calf. A third bullet entered and exited Shearyia's body through her thigh. The fourth bullet entered the crown of her head and passed through her brain, causing bone fragments to chip off.

Rueben Harrison was shot three times. One bullet struck his pelvic bone, and ricocheted through his body into his abdomen, liver, heart and lung, finally coming to rest in his armpit. A second bullet hit his hip bone, and exited through the front of his leg. A third bullet broke his femur bone, and exited his body at his front thigh. The medical examiner testified that the broken bones would have caused excruciating pain and immediately disabled Rueben.

Four-year old Nykia was shot one time behind her left ear. The bullet moved through her skull and cerebellum to the base of her skull, into her esophagus and trachea, causing substantial damage and bleeding, before exiting her chest. The medical

---

[4] Shearyia Stephens was also known as Sheryia Benns.

4

examiner testified that the bullet's path was consistent with Nykia ducking her head and body toward the shooter prior to being shot.  In addition, the presence of blood in Nykia's lungs indicated that she had taken one or two breaths between being shot and dying.  Her body was found lying on top of her uncle's body.

Evidence presented at trial showed that Juniper and Keshia had been involved in an on-again, off-again tumultuous relationship for approximately two years.  On the morning of the shootings, Juniper telephoned his friend, Renee Rashid, from his mother's house where he was living at the time.  Juniper asked Rashid to drive him to Keshia's apartment so that he could retrieve some of his belongings.  A short time later Rashid picked up Juniper at his mother's house and drove him to Keshia's apartment.

Both Juniper and Rashid entered Keshia's apartment, which was on the second floor of the apartment building.  Rashid saw four individuals in the apartment: Keshia, Rueben, who was asleep on the couch, and two of Keshia's children, Nykia and Shearyia, who were preparing to take a bath.  After helping Juniper disconnect a DVD player, Rashid was talking to the two girls, but overheard Juniper and Keshia arguing in another room. Keshia repeatedly made comments such as, "[T]here's nobody but you.  I told you I'm not seeing anybody but you."

After Rashid announced that she was leaving, Juniper followed her to the door of the apartment. Hearing the door shut, Rashid assumed Juniper was behind her as she began to descend the apartment building steps. But as she was going down the stairway outside Keshia's apartment, Rashid heard a "loud boom" that she described as "sound[ing] like the door being kicked in." Not stopping to look behind her, Rashid hurried to her car. While waiting in her car outside the apartment, Rashid heard Keshia crying and repeating her statement that she was not seeing anyone but Juniper. Rashid sounded her horn to alert Juniper that she wanted to leave. Juniper yelled at Rashid to "Go ahead" so she began to drive away. As she drove away from the apartment she heard four "booms," which she described as "sound[ing] like gunshots."

Rashid did not stop, but proceeded to Juniper's mother's house, and expressed her concern that Juniper had remained at Keshia's apartment. Juniper's friend, Keon Murray, was there when Rashid arrived. Juniper called his mother's house and Murray talked to him on the telephone. Murray observed that Juniper was calling from Keshia's apartment because the Caller ID number matched Keshia's telephone number. Juniper told Murray that "They gone," and that Keshia's apartment was surrounded. He also stated that he "killed them," although he did not name particular individuals.

6

Murray then called Tyrone Mings, a friend who lived near Keshia's apartment building, and asked him to check Keshia's apartment. Mings walked to the apartment and observed that the front door appeared to have been kicked in. Upon entering Keshia's apartment, Mings testified that he saw Juniper standing in the living room with a white substance on his face and holding an automatic pistol. When Mings asked Juniper about Keshia, Juniper directed Mings to the back of the apartment. Upon entering the master bedroom, Mings saw Rueben and a young girl lying on the bed. Mings did not see Keshia and asked Juniper where she was. Juniper told Mings she was "between the bed and the dresser." Mings returned to the bedroom and called to the people in the room, but no one answered. Mings departed Keshia's apartment, leaving Juniper in the living room, still holding the pistol. Upon returning to his apartment, Mings called the police.

In the meantime, Rashid and Murray picked up Juniper's cousin ("Little John") and drove to Keshia's apartment. Murray and Little John went to look for Juniper, while Rashid stayed in the car. They returned to the car with Juniper, who sat in the front passenger seat next to Rashid, the driver. Rashid described Juniper as being "jittery" and "breathing real hard." Juniper kept looking in the mirrors, saying, "they're behind us" throughout the car ride. Murray stated that Juniper "look[ed]

7

nervous," "[l]ike he was in shock," and that he had a powdery substance like cocaine on his face. Juniper held a black and chrome automatic pistol in his right hand, resting on his lap.

The police first arrived at Keshia's apartment complex at 12:50 p.m., after receiving a telephone call reporting possible gunshots. The responding officer walked around the apartment building and spoke with two residents, but did not go up the stairway to Keshia's apartment. After conferring with a second police officer who had arrived on scene, both officers left the apartment complex believing the call to have been a false report.

Mings observed the officers leave and called the police a second time. Near 2:20 p.m. police officers again arrived at the apartment complex and this time went up the stairway to Keshia's apartment. Officer W.G. Snyder testified the "whole center part of the door was completely knocked . . . inward into the apartment, and wooden debris from the door was lying inside the apartment." The officers entered the apartment, and observed Nykia's body lying across Rueben on the bed in the master bedroom. They then observed Shearyia's body lying across Keshia's body on the floor beside the bed. The officers received no response from any of them.

Police investigators recovered a cigarette butt from the floor by the front door of Keshia's apartment. From the master

8

bedroom where the bodies were located, investigators recovered a knife blade, a knife handle, and shell casings. Shell casings were also found in a bathroom adjoining the master bedroom.

A firearm and toolmark examinations expert testified that bullet casings found in the apartment and the bullets recovered from the victims' bodies were fired from a single nine-millimeter, Luger semi-automatic pistol.[5] The expert also analyzed the recovered knife blade and knife handle and determined that the blade and handle were originally joined.

A latent fingerprint expert testified a fingerprint found on the knife blade had "a minimum of 23 matching characteristics" to Juniper's right thumbprint. In addition, an expert in forensic serology and DNA analysis testified that Juniper's DNA profile matched DNA from the knife handle[6] and the cigarette butt.[7]

The police obtained warrants for Juniper's arrest and he surrendered voluntarily on January 26, 2005. While incarcerated at the Hampton Roads Regional Jail awaiting trial, Juniper

---

[5] The firearm was never recovered.
[6] Sixteen loci from the knife handle matched Juniper's DNA profile. The DNA expert testified that Juniper could not be excluded as the source of the DNA, with the odds of another individual having a matching DNA profile being one in greater than six billion individuals, the population of the world.
[7] Fifteen loci matched Juniper's profile from the DNA on the cigarette butt; again, the DNA expert testified that Juniper could not be excluded as the source of the DNA, with the odds of

admitted to a fellow inmate, Ernest Smith, that he committed the murders. Smith testified that while the two were together in the medical pod at the Hampton Roads Regional Jail, Juniper confessed to shooting the four victims. Smith testified that Juniper told him that he had killed the children because "he didn't want to leave any witnesses at the scene of the crime."

### B. PENALTY PHASE

During the penalty phase, the Commonwealth introduced evidence of Juniper's criminal record, which contained convictions for grand larceny, possession of cocaine, possession of marijuana, threatening to kill, disorderly conduct, failure to appear, and numerous motor vehicle violations. The Commonwealth contended its evidence proved the aggravating factors of both future dangerousness and vileness.

The Commonwealth also introduced evidence of Juniper's violent behavior and unadjudicated criminal conduct. Several of

---

another individual having a matching DNA profile being one in greater than six billion individuals.

the Commonwealth's witnesses testified about Juniper's tumultuous and abusive relationship with Keshia. Ruqayyah Barnes described an incident that occurred at a night club in August 2003. She was present when Juniper accused Keshia of "some guy looking at her, and so he started getting mad and calling her names. He told her, 'Bitch, get over here right now before I whoop your ass,' and said, 'That guy looking at you.' " Ruqayyah testified that Juniper was "screaming" these things to Keshia and "standing right in front of her face." According to her testimony, Juniper yelled at Keshia because "[t]hat nigger over there looking at you." And accused Keshia of "f**king with him."

Ruqayyah also testified about an event in September 2003. She and Keshia returned from shopping when Juniper began fighting with Keshia. He complained that Keshia and Ruqayyah were

> taking too long and [Keshia] don't do s**t for no kids. He do everything. He feed them. He do their hair. He buy their clothes. He do everything. They're his kids. . . . And then he pulled her by her hair and start screaming in her face about us being gone at the mall too long. Then he punched her in her face. She fell down on the floor. She slid back in the hallway into the kitchen.

Ruqayyah clarified that Juniper "just grabbed [Keshia's] hair and yanked it real hard and she came closer to him." When Juniper punched Keshia, he did so "with a closed fist . . . right in her eye."

11

Ruqayyah's sister, Malika T. Barnes, testified that in the spring of 2003, she witnessed Juniper trying to get Keshia's attention, and when Keshia did not respond to her name, he said, " 'B, I know you heard me calling you,' " before "calling her a whole bunch of names." When Keshia sat down in the room where Malika and Juniper were located, Juniper "told [Keshia] to go back in the room." When Keshia did not leave, Juniper "grabbed her by her arm and got her, and guid[ed] her toward the room."

Malika also described an incident that occurred at the food store where Keshia worked. Before Malika entered the store, Juniper told her that Keshia was cheating on him. Juniper followed Malika into the store and "told Keshia to go to the back to get something, and she didn't move fast enough to get it." So Juniper pulled Keshia's arm as he "fuss[ed] and holler[ed] as usual."

In the summer of 2003, Malika witnessed Juniper "grabb[ing] Keshia's arm." In clarifying what she saw, Malika stated that Juniper grabbed Keshia "[f]orcefully" and "grabbed her arm to direct her toward him." When Malika confronted Juniper for acting that way, Malika testified that Juniper responded, " 'That's my bitch.' 'That's my hoe.' 'When I tell my bitch to come here, that's what I want her to do.' " He then threatened to "f**k all [you] bitches up."

The assistant manager of the food store where Keshia worked recounted several verbal and physical altercations between Juniper and Keshia. In January 2003, the assistant manager observed Juniper approach Keshia after she smiled at a customer. She testified that Juniper had told Keshia that he would "smack the s**t out [of] you, bitch, for smiling at the customer that went out."

The manager also described an incident she observed between Keshia and Juniper in the spring of 2003. According to her testimony, Juniper

> punched [Keshia] in her face, and her wig came off. She picked her wig back up and put it on. By that time I was getting out [of] the car. Keshia ran in the [food store], and I unlocked the office. And I took her in the office, and I told her that he had to leave the premises or I was going to call the police. After that he was barred from the store.

The manager confirmed that by "punch" she meant that Juniper's "right hand [was] balled up into a fist with [his] fingers curled into [his] palm."

In June 2003, police responded to a domestic dispute between Juniper and Keshia. Juniper admitted to "slap[ping]" duct tape on Keshia's arm, mouth, and head in order to "keep her quiet," and confirmed that he had "done that before." Juniper was charged with abduction as a result of this incident, but the charges were not prosecuted because Keshia failed to appear in court.

Other witnesses described Juniper's conduct while incarcerated. A deputy in the Norfolk Sheriff's Department testified that when she informed Juniper that he did not have any mail that day, he responded by calling her "a cracker ass whore" and telling her to "Walk away, you f**kin' bitch. Carry your ass away, you f**kin' bitch."

During a search of Juniper and his jail cell in April 2004, corrections officers found a large paper clip concealed under Juniper's tongue. Possession of the paper clip was prohibited contraband because it could be used as a weapon or handcuff key.

In October 2004, Juniper attacked a sleeping inmate with a pillowcase containing dominoes and kicked the inmate in the ribs. Juniper left the scene of the attack when challenged by another inmate and ran into an elderly inmate's cell, whereupon he took the footrest from the inmate's wheelchair. Juniper then confronted the other inmates with the wheelchair footrest, threatening, "I kill you." It required several officers fifteen to twenty minutes to stop Juniper's attack.

Juniper offered evidence in mitigation including testimony from his older sister regarding the physical abuse that he suffered as a child from his stepfather, who sold drugs from the home where Juniper lived. Juniper never met his actual father until he was 23 years old, and had no male role models growing up except his maternal grandfather. Juniper's sister and aunt

14

testified that Juniper had a close relationship with his maternal grandfather and was greatly affected by the grandfather's death when Juniper was a youth. Witnesses also testified about Juniper's generosity and caring relationship with several young children, including Keshia's children.

Dr. Thomas Pasquale, a clinical psychologist appointed to assist Juniper by performing a psychological assessment, testified as to his findings. He found significant problems with Juniper's family of origin including the lack of a "consistent father figure" and a "withdrawn" and "emotionally absent" mother. These inadequate relationships in addition to physical abuse caused Juniper to "fe[el] abandoned," have "difficult[y] trust[ing] people" and conclude that "if you're not in control, then you're likely to be harmed."

Dr. Pasquale found that Juniper had an average I.Q. and was not a psychopath, but he determined that Juniper had "features of a characterological dysfunction, personality disorder which demonstrated a failure to adapt [and] develop." Dr. Pasquale listed the characteristics of this personality disorder for the jury:

> Antisocial thought and behavioral patterns, difficulties with impulsivity, reliance on the more primitive defense mechanisms of denial and blame, an easily compromised conscience, problems with anger, mood instability, alcohol and drug abuse, and chronic difficulties with the legal system.

15

Dr. Pasquale diagnosed Juniper with depression, alcohol, cocaine and marijuana dependence, and antisocial personality disorder.

## II. ANALYSIS

### A. PRELIMINARY ISSUES

Juniper presents 33 assignments of error in this appeal.[8] We will initially dispose of those assignments of error that were not adequately preserved for appeal and therefore will not be considered.

#### 1. ASSIGNMENTS OF ERROR WAIVED, DEFAULTED, OR ABANDONED

##### a. Motion for Forensic Expert

Juniper contends "[t]he trial court erred in failing to entertain and rule upon Juniper's filed Motion for a Forensic Expert." The record contains no such motion, although Juniper filed a document styled Memorandum in Support of Motion for Appointment of Forensic Expert. Juniper cites only the Memorandum in his argument on this assignment of error. The trial court never ruled on Juniper's request for a forensics expert, but the record reflects no request for a ruling or that the trial court was ever alerted to the existence of the Memorandum. Therefore, Juniper has waived any claim under this assignment of error because he was required to request a ruling from the trial court and he failed to do so. Lenz v.

Commonwealth, 261 Va. 451, 463, 544 S.E.2d 299, 306, cert.

denied, 534 U.S. 1003 (2001) (failure to request ruling on

pretrial motion waived issue on appeal); Riner v. Commonwealth,

268 Va. 296, 323-25, 601 S.E.2d 555, 571-72 (2004) (failure to

alert trial court to fact that it had ruled only on

admissibility of primary hearsay in statement waived defendant's

argument on appeal that the statement was inadmissible as second

level hearsay).

b.   Motion for Change of Venue

Juniper assigns error to the trial court's "denying" his

motion for a change of venue and argues the trial court abused

its discretion in doing so.  The Commonwealth responds that

Juniper waived this argument on appeal because he failed to

renew the motion prior to trial.

In a pretrial motion for a change of venue Juniper's

counsel stated, "We make [the motion] at this time anticipating

that the Court is going to take it under advisement.  We will

continue to make it as we . . . believe that the potential juror

pool is tainted by [media] coverage."  The trial court took the

motion under advisement, but Juniper never renewed the motion

before the jury was empanelled.

---

[8] Juniper filed 34 separate assignments of error, but in his brief to this Court he withdrew Assignment of Error No. 4. Therefore, it will not be considered on appeal.

17

> [W]hen a change of venue motion is taken under
> advisement or continued until the jury is empaneled,
> it is incumbent on the party seeking a change of venue
> to renew the motion or otherwise bring it to the
> court's attention. Failure to do so implies
> acquiescence in the jury panel and is tantamount to
> waiver of the motion for change of venue.

Jackson v. Commonwealth, 266 Va. 423, 430-431, 587 S.E.2d 532, 539 (2003), cert. denied, 543 U.S. 842 (2004) (citation omitted).

Accordingly, Juniper has waived any claim under this assignment of error because he was required to timely renew the motion or bring the matter to the attention of the trial court, which he failed to do. See id.; Green v. Commonwealth, 266 Va. 81, 94-95, 580 S.E.2d 834, 842 (2003), cert. denied, 540 U.S. 1194 (2004).

### c. Motions to Produce Files

In separate assignments of error, Juniper argues the trial court erred in refusing to compel the Commonwealth to produce its files from his prior criminal convictions and of unadjudicated bad acts that would be referenced in the penalty phase. He also claims an entitlement to the files related to a prior prosecution of Rueben for rape.

On appeal, Juniper argues the prior criminal conviction and unadjudicated bad acts files should have been produced because "to thoroughly investigate and to essentially reconstruct those 35 . . . events was unduly burdensome, if not impossible." As

18

to Rueben's files, Juniper's appellate argument is the "files cannot be reasonably recreated . . . and . . . his constitutional rights were violated by the failure to compel the file."  Neither argument was made to the trial court.

At trial, Juniper made the same argument as the basis to grant both motions:

> Although the Defendant has an investigator available to him, the time to interview all the witnesses that would be essential to reconstructing the information contained in those files cannot [be] reasonably ascertained by the Defendant without extensive costs to the Commonwealth in the form of attorneys fees and/or investigator fees.

This ground was reemphasized by defense counsel's oral argument that "it would be more economical for the Commonwealth if they would provide us with the files rather than having [defense counsel or the court-appointed investigator] have to try to reconstruct each of those separate 35 events."  In other words, Juniper's sole contention at trial for both motions is that granting the motions would save the Commonwealth money.[9]  This is obviously not the argument Juniper makes on appeal; therefore, consideration of either assignment of error is barred under Rule 5:25.  See Buck v. Commonwealth, 247 Va. 449, 452-53, 443 S.E.2d 414, 416 (1994).  Furthermore, Juniper proffered no evidence or

---

[9] Juniper has never contended that the Commonwealth failed to disclose any exculpatory evidence contained in any of the files that were the subject of the motions.

19

explanation as to any nexus between Rueben's rape conviction and any matter at issue in this case.

####     d.    Using "Exceedingly Difficult" Instead of "Substantially Impair" During Voir Dire

Juniper also claims the trial court erred "by changing the standard death penalty voir dire partially through jury selection by using the phrase 'exceedingly difficult' instead of 'substantially impair.'

Part of the way through voir dire of the potential venire, the trial judge stated, "When I ask these questions[,] instead of using ['substantially impair,'] I'm going to start [using the term] ['exceedingly difficult.']  I think substantially impaired – I think it's a legal term [and] I'm not sure the jurors understand what I'm talking about when I say that."  Juniper's counsel responded, "We don't quarrel with that but the case law does use substantially impair."  The trial judge then noted, "If you-all want to use it in your questions that's fine, but I've just noticed when I'm asking the question their eyes seem to glaze over when I start saying things like that."  Juniper's counsel replied, "That's fine."

This exchange clearly shows that Juniper's counsel not only did not object to the trial court's decision to alter the voir dire language, but acquiesced to it.  Consequently, Juniper has waived any right to appeal on this issue under Rule 5:25.

    e.    Grant of Immunity to Keon Murray

Juniper argues the trial court erred in "allowing the Commonwealth to grant immunity to witness Keon Murray with no notice, contrary to the law, and due process rights of [Juniper]."

Keon Murray testified for the Commonwealth.  At the beginning of his testimony, he agreed that no "promises [had] been made to [him] by the Commonwealth in exchange for [his testimony]."  Murray testified that he was close to Juniper and his family and knew Keshia.  When questioned about the events on the day of the murders, Murray answered, "Your Honor, I plead the Fifth."  The trial court called a recess and outside of the presence of the jury, the Commonwealth stated its intention to offer Murray immunity.[10]  Defense counsel stated his objection as follows:

> I object to the procedure . . . on behalf of defendant, Mr. Juniper.
>
> . . . .
>
> The question is whether or not this procedure denies the defendant due process of the law.
>
> . . . .
>
> [T]hreatening [Murray] about his testimony is a denial of due process to Mr. Juniper.  That's the best argument I can make.

---

[10] The Commonwealth determined Murray could incriminate himself as an accessory after the fact or give information that could lead to a charge of misprision of a felony offense.

21

On appeal, Juniper argues the grant of immunity was an abuse of discretion because it prevented effective cross-examination of Murray in violation of Juniper's due process rights under the Sixth Amendment. Specifically, Juniper contends that "since the grant of immunity was contemporaneous with the witness's testimony," the defense lacked "[t]he pre-trial preparation and reflection required" to allow a full and fair examination of Murray.

In response, the Commonwealth essentially argues that Juniper has waived this due process argument because he failed to assert a violation of the Sixth Amendment Confrontation Clause in the trial court. We agree with the Commonwealth because the record reflects Juniper never argued to the trial court the Confrontation Clause claims he now makes on appeal as the basis of his due process argument.

As he acknowledges on appeal, Juniper's argument that the trial court's decision undermined his ability to cross-examine Murray, is actually a claim under the Sixth Amendment Confrontation Clause. As such, a general assertion of a due process violation in the trial court is insufficient to preserve this argument for appeal. See Albright v. Oliver, 510 U.S. 266, 273 (1994). Therefore, Juniper has waived this assignment of error under Rule 5:25.

     f.   Penalty phase jury instructions and verdict forms

Juniper assigns error to the trial court "allowing instructions and verdict forms in the penalty phase regarding future dangerousness when the predicates were not proven and that unanimity is required to prove an aggravating factor for death."

On brief, Juniper argues only that the trial court was wrong in "refusing Instruction D-P8."[11] The Commonwealth contends that Juniper waived the argument regarding instruction D-P8 because the record does not indicate that Juniper ever submitted the instruction to the trial court, nor does Juniper mention the instruction during his arguments and objections regarding other refused jury instructions.

The record supports the Commonwealth's claims. The only mention of instruction D-P8 in the record appears in the text of

---

[11] Instruction No. D-P8 states:
Part A
If you can possibly reach a unanimous verdict, it is your duty to do so. You should listen to the views and opinions of your fellow jurors and give consideration to what they say. However, you should reach an agreement only if that can be done without sacrificing your individual judgment. During your deliberations each of you should not hesitate to re-examine your own views and change your opinion if you are convinced it was wrong. No juror, however, should give up his or her honest opinion solely because of the opinions of other jurors or for the mere purpose of returning a unanimous verdict.
Part B
In the event you cannot agree as to the sentence, the court will dismiss you and impose a sentence of imprisonment for life. That life sentence will be a life sentence without the possibility of parole.

the instruction and Juniper's Memorandum in Support of Instruction No. D-P8, which is dated January 13, 2005.  Because the record does not show that the trial court ruled on Instruction D-P8 or that Juniper requested a ruling or objected to a ruling made, even if the assignment of error had corresponded to Juniper's arguments regarding Instruction No. D-P8, this Court would not consider the merits of the claim.  See Lenz, 261 Va. at 463, 544 S.E.2d at 306.

### 2.   ISSUES PREVIOUSLY DECIDED

Included in Juniper's assignments of error are arguments this Court has previously rejected on several occasions. Finding no reason to modify or revisit our expressed views on these issues, we adhere to our previous holdings and reject the following contentions.

### a.   The Constitutionality of Virginia's Capital Murder and Death Penalty Statutes

Juniper challenges the constitutionality of Virginia's capital murder and death penalty statutes, but cites only Code § 19.2-264.4 and § 19.2-264.5.  All of the arguments Juniper posits in support of his assignment of error have been previously considered and rejected by this Court:

(1)   The terms "future dangerousness" and "vileness" are unconstitutionally vague, failing to provide the sentencer with meaningful instruction to avoid the arbitrary and capricious infliction of a death sentence.  Rejected in Beck v. Commonwealth, 253 Va. 373, 387, 484 S.E.2d 898, 907, cert. denied, 522 U.S.

24

1018 (1997) ("vileness"); Mickens v. Commonwealth, 247 Va. 395, 403, 442 S.E.2d 678, 684, ("vileness" and "future dangerousness"), vacated and remanded on other grounds, 513 U.S. 922 (1994); see also Jackson v. Commonwealth, 267 Va. 178, 205-06, 590 S.E.2d 520, 535-36, cert. denied, 543 U.S 891 (2004) ("future dangerousness"); Wolfe v. Commonwealth, 265 Va. 193, 208, 576 S.E.2d 471, 480, cert. denied, 540 U.S. 1019 (2003) ("vileness" and "future dangerousness").

(1)  The statutes impose unconstitutional barriers to a jury's consideration of mitigation evidence. Rejected in Watkins v. Commonwealth, 229 Va. 469, 490-91, 331 S.E.2d 422, 438 (1985), cert. denied, 475 U.S. 1099 (1986); see also Swann v. Commonwealth, 247 Va. 222, 228, 441 S.E.2d 195, 200, cert. denied, 513 U.S. 889 (1994).

(2)  The statutes are unconstitutional because they permit a sentencer to find future dangerousness based upon unadjudicated criminal conduct. Rejected in Stockton v. Commonwealth, 241 Va. 192, 209-10, 402 S.E.2d 196, 206, cert. denied, 502 U.S. 902 (1991); see also Jackson, 267 Va. at 206, 590 S.E.2d at 536.

(3)  The statutes permit consideration of a post-sentence report that may infringe upon defendant's right to due process, to confront accusers, to be free from cruel and unusual punishment, and to effective assistance of counsel because the report may contain hearsay and permits the death sentence despite a showing of good cause that a life sentence is just and appropriate.  Rejected in O'Dell v. Commonwealth, 234 Va. 672, 701-02, 364 S.E.2d 491, 507-08, cert. denied, 488 U.S. 871 (1988); Breard v. Commonwealth, 248 Va. 68, 76, 445 S.E.2d 670, 675-76, cert. denied, 513 U.S. 971 (1994) ("good cause" for life sentence); see also Jackson, 267 Va. at 206, 590 S.E.2d at 536 (rejecting both arguments).

(2)  The statutes deny individuals sentenced to death from meaningful appellate review.  Rejected in Smith v. Commonwealth, 239 Va. 243, 253, 389 S.E.2d 871, 876 (1990), cert. denied, 498 U.S.

881 (1990); see also Stockton, 241 Va. at 215-16, 402 S.E.2d at 210.

b.    Denial of Motion for a Bill of Particulars – Penalty Phase

Juniper assigns error to the trial court's denial of his Motion for a Bill of Particulars to require the Commonwealth to describe the theory it intended to rely upon to prove the "vileness" factor at sentencing under Code § 19.2-264.2 and 19.2-264.4(C).  But we have repeatedly held that the Commonwealth need only allege the elements of capital murder set forth in Code § 18.2-31 without providing the accused with notice of additional allegations or a bill of particulars regarding aggravating factors.  See, e.g., Muhammad v. Commonwealth, 269 Va. 451, 493-94, 619 S.E.2d 16, 40 (2005) ("[I]n Virginia, if the indictment gives a defendant sufficient notice of the nature and character of the offense charged so he can make his defense, no bill of particulars is required . . . . [A]ggravating factors are not constitutionally required to be recited in a capital murder indictment." (citations omitted)); see also Swisher v. Commonwealth, 256 Va. 471, 480-81, 506 S.E.2d 763, 768 (1998), cert. denied, 528 U.S. 812 (1999).

The trial court thus did not abuse its discretion in denying Juniper's motion for a bill of particulars.  See Quesinberry v. Commonwealth, 241 Va. 364, 372, 402 S.E.2d 218, 223, cert. denied, 502 U.S. 834 (1991).

c.    Conducting Voir Dire in Panels of Five

Juniper also contends the trial court erred "in conducting voir dire of the potential jurors regarding questions of death in panels of five."  His argument is based on the contention that individual voir dire "is the best process for ensuring that truly unbiased, unprejudiced jurors are chosen to sit in judgment of the defendant."  We have previously ruled that the manner of conducting voir dire rests "within the [trial] court's discretion."  Fisher v. Commonwealth, 236 Va. 403, 410-11, 374 S.E.2d 46, 50 (1988), cert. denied, 490 U.S 1028 (1989).  In Beavers v. Commonwealth, 245 Va. 268, 276-77, 427 S.E.2d 411, 417-18, cert. denied, 510 U.S. 859 (1993), we expressly upheld the trial court's discretion to question prospective jurors in panels of five.  Juniper makes no individualized claim of impartiality or prejudice as a result of the trial court's manner of conducting voir dire.  Consequently, we find no reason to revisit our previous holdings on this issue.

B.    PRE-TRIAL PROCEDURAL CHALLENGES

1.    REFUSAL TO DISQUALIFY THE COMMONWEALTH'S ATTORNEY

Juniper contends the trial court erred in failing to disqualify the Commonwealth's Attorney for the City of Norfolk, John R. Doyle, III, because of his previous representation of Juniper in a criminal case ten years earlier.  In addition, Juniper challenges the trial court's denial of his request to

cross-examine Doyle at the hearing on his disqualification motion.

In 1994, Doyle represented Juniper on charges of escape without force and trespass. Juniper pled guilty and entered into a plea agreement with the Commonwealth. Juniper alleges Doyle's former representation in this unrelated matter created a conflict of interest in the case at bar which could be cured only by Doyle's disqualification from prosecuting him. Juniper also argues he should have been allowed to cross-examine Doyle because Juniper carried the burden of proof on the disqualification motion. See Powell v. Commonwealth, 267 Va. 107, 138, 590 S.E.2d 537, 556, cert. denied, 543 U.S 892 (2004).

At the hearing on the disqualification motion, Doyle represented to the trial court that he gained no privileged information from his prior representation of Juniper, harbored no animosity towards him as a result of that representation, and had no personal interest in the prosecution of the case at bar. Juniper made no argument and presented no evidence to the contrary. Neither Doyle nor Juniper had a personal recollection of the prior representation. Furthermore, Doyle represented that the Commonwealth would not use the record of that former conviction as evidence. In response, Juniper agreed that this concession by the Commonwealth benefited him, but then made the argument that allowing Doyle to continue the prosecution did not

"[do] justice . . . to the community represented by the jury which arguably should have that evidence."  Juniper does not repeat this argument on appeal, but simply contends Doyle's status as Commonwealth Attorney creates an undefined conflict of interest.  All of Juniper's arguments are meritless.

The interest to be considered on a motion for disqualification of a prosecutor is the protection of the defendant's former attorney-client relationship and his right to a fair trial in the matter at hand.  See Powell, 267 Va. at 139, 590 S.E.2d at 557 (Commonwealth's attorney need not be disqualified if defendant's antagonism had no "effect on his professional judgment in seeking fairly and impartially to see justice done"); Cantrell v. Commonwealth, 229 Va. 387, 394, 329 S.E.2d 22, 26-27 (1985) (due process rights of criminal defendant violated when Commonwealth's Attorney who has conflict of interest relevant to defendant's case prosecutes defendant).

Juniper has alleged no personal prejudice in the trial of his case as a result of the former attorney-client relationship with Doyle.  The trial court argument that Doyle's offer not to use his former conviction does an injustice to the jury and the community at large is irrelevant, if not frivolous.  The trial court thus did not err in denying Juniper's motion for disqualification nor in refusing his request to cross-examine Doyle at the hearing on that motion.

29

2.    REFUSAL TO FUND EXPERT WITNESSES

Juniper separately assigns error to the trial court's denial of his motions to fund a corrections expert and mitigation expert in addition to those experts already appointed by the court.[12]

Citing Skipper v. South Carolina, 476 U.S. 1 (1986), and Eddings v. Oklahoma, 455 U.S. 104 (1982), Juniper contends that failure to provide funds for his requested experts excluded mitigation evidence in violation of his federal constitutional rights.  We disagree.  The cases Juniper cites establish the admissibility of specific mitigating evidence, not a constitutional mandate that certain expert assistance be provided an indigent defendant.[13]  See Skipper, 476 U.S. at 4-5 (defendant's behavior during incarceration relevant to determination of future dangerousness); and Eddings, 455 U.S. at 116 (background and mental and emotional development of youthful defendant must be considered a mitigating factor).  These cases provide no support for Juniper's argument that his

---

[12] The trial court entered orders allowing Juniper to retain Wayne Kennedy as a special investigator for the defense, and appointing Dr. Thomas A. Pasquale, Ph.D., as a mental health expert "to assist defense counsel in the preparation and presentation of information concerning the defendant's history, character, or mental condition."

[13] Ake v. Oklahoma, 470 U.S. 68, 77 (1985), established a three part test to determine when the Constitution requires that certain expert assistance be provided an indigent defendant.

30

constitutional rights were violated by the trial court's denial of his motion to fund mitigation and corrections experts.

Instead, we note that while the Commonwealth is required to provide adequate expert assistance to indigent defendants in certain circumstances, it is not required to provide them with "all assistance that a non-indigent defendant may purchase." Husske v. Commonwealth, 252 Va. 203, 211, 476 S.E.2d 920, 925 (1996), cert. denied, 519 U.S. 1154 (1997).

> [A]n indigent defendant seeking the appointment of an expert has the burden of showing a particularized need therefor. The required showing must be determined on a case-by-case basis, and a determination whether an adequate showing has been made is a matter that rests within a trial court's discretion. . . . A hope or suspicion that favorable evidence may be procured from an expert, however, is not sufficient to require the appointment of an expert.

Barnabei v. Commonwealth, 252 Va. 161, 171, 477 S.E.2d 270, 276 (1996), cert. denied, 520 U.S. 1224 (1997) (citation omitted). The Commonwealth maintains that Juniper failed to show a particularized need for either of these experts.  We agree.

With regard to the corrections expert, Juniper argued that such a person was "necessary to examine the defendant's background, behavior in the Norfolk City Jail and previous incarcerations and provide testimony and documents."  He proffered no reason why examination of such records could not be

---

Juniper has made no argument under Ake that his requested experts are "basic tools of an adequate defense."  Id.

31

adequately conducted by his counsel, investigator or mental health expert.  As Juniper failed to show a particularized need for a corrections expert, the trial court properly denied his motion.

Juniper contended the mitigation expert could "locate essential witnesses and data, examine and evaluate testimony and documents."  In denying this motion, the trial court noted that the services of the requested mitigation expert were duplicative of those of the court appointed private investigator, Wayne Kennedy.

> I can't think of anybody who's better qualified to locate essential witnesses and data, examine and evaluate testimony and documents than [Wayne Kennedy] is.  I don't know how much money the court authorized for Mr. Kennedy when he was appointed, but [if there] are other things that you all think he needs to do and you need to come back, do so.  Wayne Kennedy is perfectly capable of doing these things, so that motion is denied.

Although not receiving the particular expert he requested, Juniper, in fact, received the services he requested.  Thus, his motion for a mitigation expert was properly denied.  See Winston v. Commonwealth, 268 Va. 564, 581, 604 S.E.2d 21, 30-31 (2004), cert. denied, ___ U.S. ___, 126 S.Ct. 107 (2005).

3.   REFUSAL TO PERMIT EXAMINATION OF INVESTIGATORS UNDER OATH

The trial court denied Juniper's discovery request in a Motion to Examine Investigators Under Oath in which he sought to "ensure that law enforcement officials have not concealed

32

exculpatory evidence . . . and that any and all such evidence will be available prior to trial." Juniper assigns error to this ruling arguing that the trial court abused its discretion. We find the trial court did not abuse its discretion because the motion sought material beyond the scope to which Juniper is entitled under Rule 3A:11 or any other provision of law.

There is no general constitutional right to discovery in a criminal case, even where a capital offense is charged. Strickler v. Commonwealth, 241 Va. 482, 490-91, 404 S.E.2d 227, 233, cert. denied, 502 U.S. 944 (1991). While a defendant has the right to exculpatory evidence in the Commonwealth's possession upon request, Stover v. Commonwealth, 211 Va. 789, 795, 180 S.E.2d 504, 509 (1971), Rule 3A:11 defines the other discovery available to the accused in a felony case. See Hackman v. Commonwealth, 220 Va. 710, 713, 261 S.E.2d 555, 558 (1980) (decided under previous Rule 3A:14). Under Rule 3A:11, a felony defendant is entitled to his own "written or recorded statements" made to law enforcement personnel, certain written reports in the possession of the Commonwealth, and "tangible objects . . . within the possession, custody, or control of the Commonwealth" which "may be material to the preparation of [the] defense." Rule 3A:11(b). The Rule specifically does not authorize discovery of "statements made by Commonwealth witnesses or prospective . . . witnesses to agents of the

Commonwealth . . . in connection with the investigation or prosecution of the case."  Rule 3A:11(b)(2).

Citing past instances in other cases when law enforcement failed to provide prosecutors with all exculpatory evidence in their possession, Juniper argues that he should be able to examine the Commonwealth's investigators at a pretrial hearing in order to determine independently if they have provided all Brady material to the Commonwealth's Attorney.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  Juniper offers no authority to support this argument.

It is "the individual prosecutor [who] has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  Burns v. Commonwealth, 261 Va. 307, 328, 541 S.E.2d 872, 886, cert. denied, 534 U.S. 1043 (2001) (quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995)). Juniper admitted that "the Commonwealth's Attorney has apparently disclosed all exculpatory evidence," and he does not assert that any additional discoverable material actually exists or that he has any reason to believe that there is any which has not been disclosed.

We agree with the Commonwealth that Juniper's motion is "a speculative search for evidence."  No statute or rule of court affords a defendant the right to use a pretrial hearing as a discovery vehicle in this manner.  Davis v. Commonwealth, 215

34

Va. 816, 821, 213 S.E.2d 785, 788-89 (1975); see also Williams v. Commonwealth, 208 Va. 724, 729, 160 S.E.2d 781, 784-85 (1968). Because granting Juniper's motion to examine the Commonwealth's investigators under oath would have allowed Juniper discovery which is not authorized under Rule 3A:11 or otherwise, the trial court did not abuse its discretion in denying the motion.

### 4. JURY SELECTION ISSUES

#### a. Limitation of Questions During Voir Dire

In four separate assignments of error, Juniper contends the trial court abused its discretion by limiting his voir dire examination of prospective jurors. Specifically, Juniper argues he should have been allowed to question potential jurors about (1) the age and sex of their children and grandchildren; (2) their educational coursework in psychology, psychiatry, or law; (3) their military experience, including courts martial; and (4) their "philosophical" beliefs. Although Juniper argues the trial court abused its discretion, he also relies on the statutory right to examine potential jurors on issues of relationship, interest, opinion, or prejudice under Code § 8.01-358.

The Commonwealth responds there was no abuse of discretion and that parties only have a right to ask potential jurors questions "relevant to the [Code § 8.01-358] factors of

35

relationship, interest, opinion or bias."  The Commonwealth

contends Juniper's proposed questions were not relevant to any

of those factors.

The purpose of voir dire is to protect an accused's

constitutional right to trial by an impartial jury.  U.S. Const.

Amends. VI and XIV; Va. Const. Art. I, § 8.  Code § 8.01-358

expands upon these principles by providing, in relevant part:

> [t]he court and counsel for either party shall have
> the right to examine under oath any person who is
> called as a juror therein and shall have the right to
> ask such person or juror directly any relevant
> question to ascertain whether he is related to either
> party, or has any interest in the cause, or has
> expressed or formed any opinion, or is sensible of any
> bias or prejudice therein . . . .

Even so, parties do not have "an unlimited constitutional

or statutory right to propound any question to a jury panel.

Rather, the questions propounded during voir dire must be

relevant to the factors prescribed in Code § 8.01-358."

Commonwealth v. Hill, 264 Va. 315, 319, 568 S.E.2d 673, 675

(2002), cert. denied, 537 U.S. 1202 (2003).  Thus, "[i]f an

answer to the question would necessarily disclose, or clearly

lead to the disclosure of the statutory factors of relationship,

interest, opinion, or prejudice, it must be permitted.

Questions which go beyond this standard are entirely within the

trial court's discretion."  LeVasseur v. Commonwealth, 225 Va.

36

564, 581, 304 S.E.2d 644, 653 (1983), <u>cert. denied</u>, 464 U.S 1063

(1984).  A party does not have a right to

> propound any question he wishes, or to extend <u>voir dire</u> questioning <u>ad infinitum</u>.  The court must afford a party a full and fair opportunity to ascertain whether prospective jurors 'stand indifferent in the cause,' but the trial judge retains the discretion to determine when the parties have had sufficient opportunity to do so.

<u>Id</u>.

i. Age and Gender of Juror's Children and Grandchildren

Juniper contends the trial court abused its discretion in restricting his voir dire of potential jurors by limiting inquiry about the specific age and gender of their children or grandchildren.  This limitation, Juniper argues, had the "potential for prejudice in contemplating punishment," because of "a parent's protective instincts toward his or her own children" in view of the young ages of Shearyia and Nykia.

The Commonwealth argues that the question requesting the age and gender of a potential juror's children and grandchildren was unnecessarily intrusive.  Furthermore, the Commonwealth avers that the actual voir dire of potential jurors ascertained whether they had children or grandchildren under the age of 14, and, if so, whether those jurors could fairly try the case.

Although the trial court did not permit an open-ended inquiry, it did permit the panels of potential jurors to be asked:  "[D]o [any of] you have children or grandchildren under

37

the age of 14?" and "Would the fact that those of you who have answered this question in the affirmative have children or grandchildren under the age of 14, given the statement of the case that was read to you by the Court . . . prevent you from giving both sides in this case a fair trial and . . . basing your verdict on the evidence?"  The trial court had informed the potential venire that "I expect that the Commonwealth will present evidence that the defendant shot and killed . . . Nykia Stephens who was four years old and Shearyia Stephens who was two years old."

Juniper conceded at trial that a juror would not be struck for cause based solely upon the age or sex of that juror's children.  He nonetheless contends the trial court abused its discretion in not permitting his requested inquiry.  We disagree with Juniper that the trial court abused its discretion.

Juniper had the opportunity to ascertain from all potential jurors if they had a child or grandchild under the age of 14. He did not ask two of the ten panels this question at all, and in two panels only asked one or two of the potential jurors. All potential jurors in the remaining six panels were asked these questions.

Furthermore, Juniper had the opportunity, in addition to the trial court's examination on bias,[14] to specifically inquire as to bias on the basis of the age of a juror's progeny.  All prospective jurors who responded that having young children or grandchildren would affect their ability to be impartial were struck for cause without objection.  Juniper thus had full knowledge of those potential jurors who had not indicated bias or prejudice as a result of having young children or grandchildren and could consider this factor in exercising peremptory strikes if he so chose.

Nonetheless, he argues, without citation to authority, that he should have been able to gather further information about the age and gender of the potential jurors' children and grandchildren.  As we noted in an analogous voir dire context in LeVasseur, 225 Va. at 582, 304 S.E.2d at 653, "[s]uch attitudes might well be interesting to counsel, but they have no relationship to the juror's ability to abide by the court's

---

[14] In addition to pursuing other specific areas of potential bias or prejudice, the trial court asked the panels variations of the following open-ended questions to determine the potential jurors' impartiality and fairness:  "Do any of you know of any reason . . . why you could not or would not be able to fairly and impartially determine the facts of the case or abide by the instructions of the Court on capital murder sentencing issues?" "Do you know of any reason . . . even if I haven't already asked you . . . that would prevent you from giving a fair and impartial trial to the Commonwealth and to Mr. Juniper based solely on the law and the evidence?"

instructions, to find the facts impartially, and to apply the law to the facts conscientiously."

Our jurisprudence according deference to the trial court's discretion in consideration of juror voir dire matters is long-standing. "Whether to permit a party to ask a question that goes beyond what is permissible under Code § 8.01-358 is a matter entirely within the trial court's discretion." Powell, 267 Va. at 143, 590 S.E.2d at 559; see also Green, 266 Va. at 96-97, 580 S.E.2d at 843 ("When, as here, a trial court affords ample opportunity to counsel to ask relevant questions and where the questions actually propounded by the trial court were sufficient to preserve a defendant's right to trial by a fair and impartial jury, we will generally not reverse a trial court's decision to limit or disallow certain questions from defense counsel."); Goins v. Commonwealth, 251 Va. 442, 458, 470 S.E.2d 114, 125, cert. denied, 519 U.S. 887 (1996) ("[S]ince [the accused] had ample opportunity to ask relevant questions, and since the questions asked were sufficient to preserve [the defendant's] right to trial by a fair and impartial jury, the trial court did not abuse its discretion in refusing to ask additional questions."); LeVasseur, 225 Va. at 581, 304 S.E.2d at 653. We see no reason not to accord deference to the trial court's ruling on this issue.

In addition to our long-standing recognition of deference to the trial court's discretion on matters of voir dire, we find instructive the decision of the Supreme Court of California, which examined a similar issue in People v. Box, 5 P.3d 130, 146-47 (Cal. 2000), cert. denied, 484 U.S. 963 (2001).

Box involved a multiple homicide, one of the victims being a three-year-old boy. Id. at 142. Defendant's counsel sought to ascertain in voir dire "whether the prospective jurors had young children or grandchildren." Id. at 147. The trial court declined to permit that inquiry, but did make specific examination of the potential venire as to any bias based on one of the murder victims being a young child. Id. Finding that "the bias these inquiries sought to uncover was adequately addressed" by the trial court's voir dire, the California Supreme Court found no abuse of discretion. Id.; see also United States v. Joe, 831 F.2d 218, 221 (10th Cir. 1987), cert. denied, 484 U.S. 1072 (1988).

In the case at bar, Juniper's counsel was permitted greater latitude of inquiry than in Box, having the ability to ascertain those potential jurors with children or grandchildren under the age of 14. The trial court, and Juniper, made full inquiry as to any bias or prejudice on the part of such potential jurors. Accordingly, we find no abuse of discretion in the trial court's refusal of Juniper's requested inquiry.

## ii. Other Questions

Juniper also contends he should have been able to inquire as to a juror's educational background in the fields of psychology, psychiatry, or law because those studies could lead to impermissible "preconceived notions" regarding the testimony of Juniper's expert witnesses or on matters of the law. The Commonwealth responds that the specific questions Juniper proposed did not inquire as to whether the potential jurors had earned particular degrees, but whether they had "any education" in the particular fields. The Commonwealth further questions the relevance of determining that "somebody once took Psych 101" to evaluate a juror's potential bias.

Juniper's concerns regarding the potential jurors' educational background in psychology, psychiatry, and law were adequately addressed by inquiring about the potential jurors' occupations and, when necessary, for a description of their work responsibilities. Little, if any, relevant information would have emerged from learning the specific coursework of a potential juror outside their particular career. The trial court did not err in barring Juniper's proposed questions.

Juniper also assigns error to his inability to question potential jurors regarding their military experience, particularly as to courts martial. He contends that such an inquiry could reveal whether potential jurors had a background

in military law enforcement or the military justice system.  The

Commonwealth argues that a juror's generic military experience

is irrelevant because "members of the armed forces generally

have no role in the investigation or prosecution of crimes."

Furthermore, the Commonwealth contends any relevant concern

regarding a background in military law enforcement was

adequately covered by the trial court's direct inquiry about law

enforcement experience.[15]

Juniper's concerns were adequately covered by the trial

court's direct question to jurors about law enforcement service.

A potential juror's military experience would have had little,

---

[15] The transcript of the voir dire depicts the relevant
question and clarification asked of the entire panel of
potential jurors:

> Have any of you or any member of your immediate
> family ever been employed in law enforcement?  I'll
> try to give you some definition.
> Immediate family I would certainly think includes
> your husband, your wife, your parents, your children,
> any relative who lives with you.  I know some families
> are closer than others.  Any family member you feel
> especially close to, I'll have to leave that up to
> your judgment.
> Law enforcement would include state, local
> police, sheriff's department, correctional officers,
> FBI agents, ATF agents, military police, secret
> service agents, naval investigators.  I'm sure there
> are other agencies I haven't thought of.
> Law enforcement officers don't include lawyers
> unless they are prosecuting attorneys, but anyway,
> with those general definitions in mind I'll restate
> the question.
> Have any of you or members of your immediate
> family ever been employed in law enforcement?

if any, probative value, as the trial court confirmed that Juniper was never a member of the armed services. To the extent that requesting the potential jurors' military service would have shed light on their law enforcement experience, the trial court's explanation of "law enforcement" covered any law enforcement experience while in military service.

Lastly, we find no merit in Juniper's assertion that the potential jurors should have been directly asked about their "philosophical" beliefs, which might affect their judgment as jurors. The trial court asked a series of questions designed to alert jurors to possible bias from their opinions or beliefs that could influence their function as impartial triers of fact. Although "religious or moral" beliefs were specifically addressed in voir dire, the trial court also inquired as to "any opinion or belief" that would influence the potential jurors' consideration of sentences of life or death and "any reason whatsoever" that would prevent them from affording Juniper a fair trial. (Emphasis added.) Juniper's request is semantic irrelevance.

The trial court did not abuse its discretion in refusing to permit Juniper to ask potential jurors any of the aforementioned questions.

b.    Failure to Strike Certain Jurors for Cause

---

(Emphasis added.)

Juniper assigns error to the trial court's failure to strike four potential jurors: Henry, Colander, Ashby, and Molinaro.  Code § 8.01-358 and Rule 3A:14 facilitate an accused's constitutional right to be tried by an impartial jury by providing that members of the venire must "stand indifferent in the cause."  A prospective juror

> must be able to give [the accused] a fair and impartial trial.  Upon this point nothing should be left to inference or doubt.  All the tests applied by the courts, all the enquiries made into the state of the juror's mind, are merely to ascertain whether [the juror] comes to the trial free from partiality and prejudice.

Wolfe, 265 Va. at 211, 576 S.E.2d at 482 (quoting Wright v. Commonwealth, 73 Va. (32 Gratt.) 941, 943 (1879)).

On appeal, this Court generally gives deference to the trial court's decision whether to strike a potential juror for cause.  Vinson v. Commonwealth, 258 Va. 459, 467, 522 S.E.2d 170, 176 (1999), cert. denied, 530 U.S. 1218 (2000).  We do so "[b]ecause the trial judge has the opportunity, which we lack, to observe and evaluate the apparent sincerity, conscientiousness, intelligence, and demeanor of prospective jurors first hand . . . ."  Pope v. Commonwealth, 234 Va. 114, 123-24, 360 S.E.2d 352, 358 (1987), cert. denied, 485 U.S. 1015 (1988) (citing Calhoun v. Commonwealth, 226 Va. 256, 258-59, 307 S.E.2d 896, 898 (1983)).  Consequently, unless "manifest error

appears in the record," the trial court's decision will not be disturbed.  Id.

In reviewing whether a potential juror should have been removed from the venire, we consider "the prospective juror's entire voir dire, not just isolated portions."  Jackson, 267 Va. at 191, 590 S.E.2d at 527.  Guided by these principles, we review the entire voir dire of the four prospective jurors Juniper argues should have been stricken for cause.

### i. Juror Henry

Juniper moved to strike prospective juror Henry for the "bias and prejudice" shown in his responses to whether he would consider life imprisonment without parole as an alternative to the death penalty.  Juniper asserts that prospective juror Henry was not successfully rehabilitated from his statement that he "would more likely favor the death penalty."  Juniper contends Henry's voir dire "demonstrated the type of preconceived opinion that the process of voir dire is designed to ferret out."

The Commonwealth submits that the totality of Henry's voir dire indicates an open mind to consideration of a sentence of life imprisonment.  In particular, the Commonwealth notes that Henry stated that he did not know whether there were mitigating factors that would affect his decision and agreed that he would "consider all the alternative punishments prior to reaching a decision."

46

The record contains the following exchange:

[DEFENSE COUNSEL]:  [You] are able to consider life imprisonment without parole as an alternative to the death penalty in this case?

MR. HENRY:  Yes sir.  It's possible, but I would more likely favor the death penalty.

. . . .

THE COURT:  You could consider life imprisonment without parole?

MR. HENRY:  It's within the realm of possibility, but not likely.

. . . .

[DEFENSE COUNSEL]:  Dr. Henry, would you restate what you said a moment ago?

DR. HENRY:  I said it's within the realm of possibility that I would – could see a sentence of life imprisonment, but most likely I would favor the death penalty based on what you've told me so far.  I don't know if there are other mitigating factors that could come up, but in general, I would favor the death penalty.

. . . .

[COMMONWEALTH'S ATTORNEY]:  So, Dr. Henry . . . you know at the end when it comes time for a jury to deliberate the Court will give you instructions setting out the law, giving you guidance as to [how to] conduct your deliberations and you could follow the Court's instructions including if the Court instructed the jury to consider all the alternative punishments prior to reaching a decision?  Is that fair to say?

[DR. HENRY]:  Yes.

In denying Juniper's motion to strike Henry, the trial court stated,

47

I gleaned from his answer he said he would be inclined to the death penalty if that is proven and the defendant is guilty of capital murder, but he could consider the other one. . . . I think Dr. Henry's voir dire in its entirety [reflects] he'd be open to consider both penalties.

Henry's overall responses to voir dire questions relevant to this particular issue reveal that he could "stand indifferent in the cause" and would consider both the prosecution and defense's evidence when determining the appropriate sentence for Juniper. He unequivocally responded "yes" when asked if he would conduct deliberations as a juror according to the trial court's instructions, and he mentioned that mitigating factors would play a role in determining Juniper's sentence.

As we have previously stated, "[t]he standard to be applied by a trial court in deciding whether to exclude or retain a prospective juror is whether the prospective juror's views 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " Breard, 248 Va. at 77, 445 S.E.2d at 676 (quoting Eaton v. Commonwealth, 240 Va. 236, 246, 397 S.E.2d 385, 391 (1990), cert. denied, 502 U.S. 824 (1991)); see also Schmitt v. Commonwealth, 262 Va. 127, 139-41, 547 S.E.2d 186, 195-96 (2001), cert. denied, 534 U.S. 1094 (2002). Henry satisfied this test by indicating that he could consider sentences both of life or death in accord with the evidence. We also afford

deference to the trial court's observation that Henry's responses showed he would "be open to consider both penalties." Therefore, we find no manifest error in the trial court's decision refusing to strike this juror for cause.

### ii.  Juror Colander

Juniper claims the trial court abused its discretion in refusing to strike prospective juror Colander from the venire because she had stated that it would cause hardship to be away from her position as a public school principal for the duration of the trial.  The Commonwealth counters Juniper's assertion by observing that difficulty finding a replacement at work is "irrelevant to any disqualifier under §8.01-358."  When refusing to strike Colander from the venire, the trial court expressed confidence that the Norfolk public school system could accommodate her absence.

Juniper has not cited, nor does the record reflect, any basis for removing Colander for cause.  Decisions of the trial court regarding whether to retain or excuse potential jurors are entitled to great deference on appeal.  As such, we find no manifest error in the trial court's decision rejecting Juniper's motion to strike Colander as a juror.

### iii. Juror Ashby

Juniper contends that prospective juror Ashby should have been struck for cause because her answers "indicated that she

[could not] sit fairly and impartially as she [had] already formed opinions regarding Juniper and the evidence before the commencement of the trial." Specifically, Juniper cites Ashby's statement that "it's hard when kids are involved" and her knowledge of the case through media coverage to support this assertion.

The Commonwealth responds that Ashby's statements plainly show she had not formed an opinion and would fairly contemplate the evidence and instructions presented at trial. The Commonwealth also relies on the trial court's observation that although "[Ashby's] answers at least regarding capital punishment were somewhat inconsistent," her responses did not provide a "reason to strike."

The following colloquy occurred after Ashby indicated she had heard "something" about the case from media reports:

> [COMMONWEALTH'S ATTORNEY]: Has what you heard about it or the seriousness of the allegations made you to [sic] form an opinion about the guilt or innocence of the person who's accused?
>
> [MS. ASHBY]: No. It haven't [sic] made me form an opinion or nothing, but it's hard when kids is involved. I'll put it that way. So I can't say. I can't form an opinion until all evidence is heard or what.
>
> [COMMONWEALTH'S ATTORNEY]: So you would base your decision on the evidence that you will hear in the courtroom which may include the deaths of children and – but make your decision on what you hear in the courtroom? You're nodding your head yes?

50

[MS. ASHBY]:  Yes.

. . . .

[DEFENSE COUNSEL]:  Ms. Ashby, based upon what you have heard or read, have you formed an opinion as to the guilt or innocence of Mr. Juniper?

MS. ASHBY:  No.  No.

The totality of Ashby's voir dire reflects that she would not rely on any information she had read or heard about the case and that she had not formed an opinion regarding Juniper's guilt or innocence.  As such, she would be able to "stand indifferent in the cause" and fairly and impartially perform the duties of a juror.

Mere exposure to media coverage does not disqualify a potential juror as long as that individual can still fairly and impartially weigh the evidence presented at trial.  See Mu'Min v. Virginia, 500 U.S. 415, 430 (1991); see also Wolfe, 265 Va. at 209-12, 576 S.E.2d at 480-82; Bell v. Commonwealth, 264 Va. 172, 192-94, 563 S.E.2d 695, 709-10 (2002), cert. denied, 537 U.S. 1123 (2003).  Consequently, we find that the trial court did not err in refusing to strike this potential juror.

### iv. Juror Molinaro

Juniper's final challenge is that prospective juror Molinaro should have been struck for cause because she was an acquaintance of the Commonwealth's Attorney.  Juniper asserts that when asked if it "would affect her ability to sit fairly

51

and impartially[, Molinaro] responded, '[I]'ve been thinking that since nine o'clock this morning, and I don't think so.' " This exchange, Juniper contends, reflects Molinaro's clear "inability to give an unequivocal answer in light of her familiarity to the prosecutor" and "illustrated her inability to be a qualified juror for Juniper."

The Commonwealth initially notes that Juniper misquotes Molinaro's response to the question regarding her impartiality in such a way that suggests equivocation on Molinaro's part that her actual response does not. The record demonstrates Molinaro's complete response was, "I've been thinking about that since nine o'clock this morning, and I don't think so." (Emphasis added). From Molinaro's actual response, the Commonwealth asserts that far from equivocation, her answers show "conscientious introspection with respect to possible bias before reaching the conclusion that she could be fair." In light of this showing of truthfulness and frankness, the Commonwealth contends the trial court did not abuse its discretion in refusing to strike Molinaro.

The record shows the following colloquy during Molinaro's voir dire:

> THE COURT: [W]hat's the nature of your acquaintance with [the Commonwealth's Attorney]?
>
> . . . .

52

MS. MOLINARO:  I know his wife from my work at
Sentara.  I did – am I allowed to say I did put some
signs up in yard[s] in the neighborhood when he was
running for Commonwealth['s] Attorney.

THE COURT:  Do you believe your acquaintance with Mr.
Doyle would in any way prejudice you in favor of the
prosecution or impair your ability to give a fair and
impartial trial to –

MS. MOLINARO:  I've been thinking about that since
nine o'clock this morning, and I don't think so.

. . . .

[COMMONWEALTH'S ATTORNEY]:  . . . I just wanted to be
sure we brought that all out.  In fact, you may be
acquainted with [Defense Counsel] as well.

[MS. MOLINARO]: I know of [Defense Counsel] through
soccer.

. . . .

[DEFENSE COUNSEL]:  Can you be certain [that you would
not be inclined or partial to the Commonwealth in this
case]?

[MS. MOLINARO]:  I feel certain that knowing him the
little that I do, that I would be an impartial juror
just because I have faith in myself, but the reason I
have been asking is because I don't do this very often
and so I do not know, but I do not think.

[DEFENSE COUNSEL]:  You threw me off.

[MS. MOLINARO]:  Yeah.  Okay.  Well, you're more
experienced with screening jurors, but I think that I
am an impartial juror.

In rejecting Juniper's motion to strike Molinaro, the trial

court stated:

I think she said she'd been thinking about it all
morning.  The impression I got from observing her
demeanor was I imagine she made up her mind she can be

53

fair in this case. . . . If people who knew the Commonwealth's attorney were disqualified from being on a jury, in most rural areas in this state you'd never have a criminal trial.

Our previous decisions have generally held that relationship does not automatically disqualify a potential juror from being fair and impartial. Wise v. Commonwealth, 230 Va. 322, 325, 337 S.E.2d 715, 717 (1985), cert. denied, 475 U.S. 1112 (1986) (citing Calhoun, 226 Va. at 263, 307 S.E.2d at 900). The overarching consideration is whether the trial court erred in determining that the prospective juror would fairly and impartially decide the accused's case. See, e.g., Jackson, 255 Va. 625, 640-41, 499 S.E.2d 538, 548 (1998), cert. denied, 525 U.S. 1067 (1999) (upholding trial court's refusal to strike a juror for cause when the juror's husband was a first cousin of the Commonwealth's attorney); Roach v. Commonwealth, 251 Va. 324, 343, 468 S.E.2d 98, 109, cert. denied, 519 U.S. 951 (1996), overruled in part on other grounds by Morrisette v. Warden of the Sussex I State Prison, 270 Va. 188, 202, 613 S.E.2d 551, 562 (2005) (upholding retention of juror when the Commonwealth's attorney in a capital case formerly represented prospective juror in a matter and the prospective juror still regarded him as his "personal attorney"); Wise, 230 Va. at 325, 337 S.E.2d at 717 (1985) (upholding retention of prospective juror who was the

Commonwealth's attorney's "golfing buddy" and "long standing" friend).

The voir dire of Molinaro demonstrates that after carefully considering her association with the Commonwealth's Attorney, she could be impartial as a juror. We do not find manifest error in the trial court's conclusion that Molinaro would "stand indifferent in the cause" and act as an impartial and fair juror.

c.   Batson Challenges

Juniper contends the trial court "erred in denying Juniper's Batson challenge to jurors Mix, McClain, Bailey, Boddie and Dawley." "In Batson v. Kentucky, 476 U.S. 79, 89 (1986), the United States Supreme Court held that excluding a potential juror solely on the basis of the juror's race is purposeful discrimination and a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution." Jackson, 266 Va. at 435, 587 S.E.2d at 542.

When a defendant makes a Batson challenge to the use of a peremptory strike, he must show that the individual "is a member of a cognizable racial group," Yarbrough v. Commonwealth, 262 Va. 388, 394, 551 S.E.2d 306, 309 (2001), cert. denied, 535 U.S. 1060 (2002) (quoting Batson, 476 U.S. at 96), and "make a prima facie showing that the peremptory strike was made on racial

55

grounds." Jackson, 266 Va. at 436, 587 S.E.2d at 542. Mere exclusion of members of a particular race by using peremptory strikes "does not itself establish such a prima facie case under Batson." Yarbrough, 262 Va. at 394, 551 S.E.2d at 309. To establish a prima facie case, the defendant must also "identify facts and circumstances that raise an inference that potential jurors were excluded based on their race." Id.

Once a prima facie case is put before the court, the burden shifts to the prosecution "to produce race-neutral explanations for striking the juror." The defendant can then argue that the prosecution's explanations were purely a pretext for unconstitutional discrimination. Jackson, 266 Va. at 436, 587 S.E.2d at 542.

Juniper offered no basis for his challenge that the strikes were racially motivated other than observing that the jurors were African-American.[16] Nonetheless, the Commonwealth offered the following race-neutral explanations for exercising its peremptory strikes against the five jurors:

_____

[16] Although Mix, McClain, Boddie, and Dawley were African-American, Juniper did not establish Bailey's race. He never inquired as to Bailey's race or offered any evidence in that regard. The trial court refused Juniper's request that it find as a matter of fact that Bailey was African-American and found "[i]t appears Ms. Bailey is white." Juniper did not assign error to that finding and under Rule 5:17(c) he cannot challenge that finding on appeal.

(1)     India Mix was struck because she had been a client of one of Juniper's attorneys in a prior criminal case.

(2)     The Commonwealth stated that it was "concern[ed]" by the fact that Charlotte McClain's brother had been prosecuted in Norfolk by the Commonwealth Attorney's Office the previous year resulting in a conviction.

(3)     Malia Bailey was struck due to "inconsistent" answers to questions regarding the possible imposition of the death penalty. The prosecutor observed that at one point in the voir dire, Ms. Bailey "was pretty close" to crying as a result of the questioning regarding the death sentence and "said at one point it makes her sick to think about . . . the possible imposition of the death penalty." In addition, the Commonwealth cited Ms. Bailey's on-going medical appointments related to breast cancer treatments.

(4)     Richard Boddie was struck because of his "affirmative [response] that it would be difficult to impose the death penalty." In addition, the Commonwealth noted that Mr. Boddie was the final potential alternate juror who had indicated "any difficulty" with the death penalty.

(5)     Michelle Dawley was struck because her brother had been convicted of murder 25 years ago, and the prosecutor believed that the conviction would affect her.

The trial court concluded that Juniper failed to satisfy the threshold requirement of a prima facie showing that any of the strikes was racially motivated. In making its decision, the trial court noted, "over the seven strikes the Commonwealth made, four were black, . . . three were white which is generally in fairly good proportion from the total mix on which they had

57

to strike."[17]  Even if a prima facie case had been made, however, the trial court found that the Commonwealth had provided a sufficient race-neutral reason to strike each prospective juror at issue.

Our previous decisions recognize the "unique opportunity to observe the demeanor and credibility of potential jurors during voir dire," and therefore afford the trial court's determination whether the Commonwealth's explanation is race neutral "great deference."  Jackson, 266 Va. at 437, 587 S.E.2d at 543.  We will not reverse the trial court's decision "unless it is clearly erroneous."  Id.

Even if we assume that Juniper made a prima facie showing, we find nothing in the record to support a conclusion that the trial court's determination was clearly erroneous.  Far from being pretextual explanations, as Juniper contends, the Commonwealth's reasons for dismissing each of the potential jurors directly related to valid race-neutral reasons.  Furthermore, "the record supports the Commonwealth's characterization of the statements made by the potential jurors in question."  See Jackson, 266 Va. at 437, 587 S.E.2d at 543.

---

[17] Even if Ms. Bailey were properly categorized as African-American, using five of seven peremptory strikes to remove potential African-American jurors would not necessarily establish a prima facie case of discrimination or overcome the prosecution's race-neutral explanations for its strikes.  See,

Finding no basis for Juniper's contention that the juror strikes were racially motivated, we will not disturb the trial court's findings that Juniper had not established a prima facie case of racial discrimination and that the Commonwealth's explanations for striking these jurors were race neutral.

### 5.  DENIAL OF SUBSTITUTE PSYCHOLOGICAL EXPERT AND FINDING OF FAILURE TO COOPERATE

The trial court granted Juniper's motion under Code § 19.2-264.3:1(A) for the appointment of a mental health expert, Dr. Thomas A. Pasquale, to assist with his defense.  Pursuant to Code § 19.2-264.3:1(F), the trial court granted the Commonwealth's request for a similar expert, Dr. David Keenan. The trial court also advised Juniper that his refusal to cooperate with the Commonwealth's expert could result in the exclusion of testimony by his expert witness or notice to the jury that Juniper refused to cooperate with the Commonwealth's expert.  Juniper acknowledged to the trial court that he understood the requirements and the potential consequences for noncompliance.  Code § 19.2-264.3:1(F)(2).

On December 29, 2004, the Commonwealth's expert, Dr. Keenan, met with Juniper.  Ten minutes into the meeting, "Juniper stood, turned around, banged on the glass, said a few things, banged on the glass."  Juniper became angry, cursed at

e.g., Chandler v. Commonwealth, 249 Va. 270, 276-77, 455 S.E.2d

59

Dr. Keenan and told a guard that Dr. Keenan was "trying to set [him] up." Juniper demanded that the guard remove him from the interview room. The interview was thus terminated, and Dr. Keenan testified that he did not "believe [he could] get any useful information from Mr. Juniper" should they arrange another meeting.

The Commonwealth then filed a motion under the provisions of Code § 19.2-264.3:1(F)(2) to bar Juniper from presenting expert testimony from Dr. Pasquale at sentencing or to permit the Commonwealth "to introduce evidence of the defendant's refusal to cooperate." Juniper filed a motion to appoint a substitute expert for Dr. Keenan. At the hearing on this motion, Juniper again acknowledged that refusal to cooperate with Dr. Keenan could result in either "tell[ing] the jury that [he] refused to cooperate or . . . exclud[ing] Dr. Pasquale." Though Dr. Keenan and Juniper's accounts of the interview questions differ, Juniper did not dispute that he refused to cooperate with Dr. Keenan or that he terminated the interview.

Rather than asking that Juniper be prohibited from presenting his own expert testimony, the Commonwealth agreed to allow Juniper to present testimony from Dr. Pasquale as long as the jury was informed of his refusal to cooperate with Dr. Keenan. The trial court found "as a matter of fact that Mr.

219, 223-24, cert. denied, 516 U.S. 889 (1995).

60

Juniper refused to cooperate with the evaluation requested by the Commonwealth," and ordered the sanction recommended by the Commonwealth.

Juniper assigns error to the trial court's finding of failure to cooperate and the denial of his motion to appoint a substitute expert in place of Dr. Keenan. Code § 19.2-264.3:1(F)(2) explicitly provides that the choice of sanction is within the trial court's discretion. Based on the record and Juniper's own admission that he made the decision to end the interview, the trial court's finding that Juniper refused to cooperate with Dr. Keenan was not erroneous. Similarly, we find the trial court did not abuse its discretion in denying Juniper's motion to appoint a substitute expert. See Mackall v. Commonwealth, 236 Va. 240, 247, 372 S.E.2d 759, 764 (1988), cert. denied, 492 U.S. 925 (1989) (indigent defendant not entitled to a second psychiatric examination at state expense where the Commonwealth already had paid for his first examination); Pruett v. Commonwealth, 232 Va. 266, 276-77, 351 S.E.2d 1, 7 (1986), cert. denied, 482 U.S. 931 (1987) (defendant "has no right to 'shop around' at state expense until he finds a doctor who will give him the opinion he wants").

## C.   GUILT PHASE

### 1.   EVIDENTIARY ISSUES

#### a.   Fitzgerald Cross-Examination

61

Juniper contends that the trial court erred by disallowing cross-examination of Terence Fitzgerald regarding "foot traffic" to and from Keshia's apartment.

Fitzgerald, a friend of Keshia's, testified that he obtained and paid the rent for the apartment in which Keshia and her children lived. On cross-examination, defense counsel attempted to ask Fitzgerald if the landlord had ever complained to him about "foot traffic" at Keshia's apartment. The Commonwealth objected on hearsay and relevance grounds. Juniper's counsel responded that the inquiry was "simply offered to show why [Fitzgerald] . . . went and talked to Keshia[-] because he received a complaint, not for the truth of [the 'foot traffic' complaint]." Fitzgerald was then asked if he "ever complained to Keshia about the traffic at the apartment" and the Commonwealth again objected. Defense counsel then argued the question was relevant "as to whether or not someone else was there or had the opportunity to be involved in these crimes. You have high traffic," and represented that she planned "to introduce evidence that the [apartment] looked like it had been searched." The trial court sustained the Commonwealth's objections.

Juniper assigns error to these rulings because he alleges the trial court disallowed questioning which "would lead to

relevant testimony tending to show [Juniper] did not commit the crime for which he was charged."  Juniper cites the following statement of law in support of this assertion:

> In Virginia, evidence that a crime was actually committed by someone other than the accused is admissible for the purpose of generating a reasonable doubt of the guilt of the accused. However, the evidence introduced must point directly to guilt of a third party. Thus, where there is a trend of facts and circumstances tending clearly to point out some other person as the guilty party, the [defendant] may introduce any legal evidence which is available tending to prove that another person committed the crime with which he is charged. The admissibility of circumstantial evidence tending to prove the guilt of a third person is left to the discretion of the trial court. Although circumstantial evidence tending to prove the guilt of a third party is to be liberally received, the evidence must be legally admissible. That is, the evidence must be relevant and material, and may not be hearsay.

Weller v. Commonwealth, 16 Va. App. 886, 890, 434 S.E.2d 330, 333 (1993) (citations and internal quotations omitted) (emphasis added), aff'd in rehearing en banc, 443 S.E.2d 171 (1994).  In Weller, the Court of Appeals affirmed the judgment of the trial court disallowing testimony that the defendant proffered to implicate a particular individual, on the grounds that such testimony was inadmissible hearsay and irrelevant.  Id. at 890-91, 434 S.E.2d at 333-34.

In this case, Juniper's attempted questioning of Fitzgerald did not implicate another particular individual in the murders. Defense counsel merely alleged that there were other people who

63

came to the apartment at unknown times, but never proffered any evidence to support this claim.  As we have previously stated,

> [p]roffered evidence that merely suggests a third party may have committed the crime charged is inadmissible; only when the proffered evidence tends clearly to point to some other person as the guilty party will such proof be admitted. . . . [A] large discretion must and should remain vested in the trial court as to the admission of this class of testimony.

Elliott v. Commonwealth, 267 Va. 396, 424, 593 S.E.2d 270, 287 (2004), cert. denied, 543 U.S. 1081 (2005) (quoting Johnson v. Commonwealth, 259 Va. 654, 681, 529 S.E.2d 769, 784, cert. denied, 531 U.S. 981 (2000)). Thus, we find the trial court correctly excluded the "foot traffic" question because it did not tend "clearly to point to some other person as the guilty party."  Id.

### b.    Admission of Exhibits

Juniper assigns error to the trial court admitting exhibits 130 and 136 into evidence on the grounds those exhibits were "prejudicial, inflammatory, and/or irrelevant."  He separately assigns error to the admission of exhibits 163-165 on the grounds those exhibits were also "prejudicial, inflammatory, and irrelevant."  In determining whether relevant evidence should be admitted, the trial court must apply a balancing test to assess the probative value of the evidence and any undue prejudicial effect of that evidence. Dandridge v. Marshall, 267 Va. 591, 596, 594 S.E.2d 578, 581 (2004).  The determination to admit

such relevant evidence rests within the trial court's sound discretion and will be disturbed on appeal only upon a showing of an abuse of that discretion. Id. The trial court did not abuse its discretion in admitting the exhibits about which Juniper complains.

Exhibits 130 and 136 are autopsy photographs of Shearyia that were admitted during the guilt phase of the trial. Exhibit 130 showed her leg with steel rods inserted to demonstrate the trajectory of the bullets. Juniper argues the Commonwealth should have used a Styrofoam model to show bullet trajectory as it did with the other victims, instead of an actual photograph of the leg. While admitting that Exhibit 130 is relevant, Juniper argues it is inflammatory and the prejudicial effect outweighs its probative value.

Exhibit 136 depicts no injury to Shearyia, but shows magic marker ink on the side of her face as Rashid described. Juniper argues that this exhibit is irrelevant and cumulative of Exhibit 135, which also depicts no injury, but shows ink on Shearyia's back.

Photographs of a victim are admissible to show motive, intent, method, malice, premeditation, and the atrociousness of the crime. Walton v. Commonwealth, 256 Va. 85, 92, 501 S.E.2d 134, 138, cert. denied, 525 U.S. 1046 (1998). The fact that the

photograph also relates to an undisputed issue does not render it irrelevant.  See Orbe v. Commonwealth, 258 Va. 390, 402, 519 S.E.2d 808, 815 (1999), cert. denied, 529 U.S. 1113 (2000) (Commonwealth could introduce photograph of victim's fatal wound even though defendant stipulated cause of death); see also Goins, 251 Va. at 459, 470 S.E.2d at 126 (photographs of victims at crime scene admissible over defendant's objection that they were irrelevant as identities of victims were not in dispute.).

In Joseph v. Commonwealth, 249 Va. 78, 86, 452 S.E.2d 862, 867, cert. denied, 516 U.S. 876 (1995), this Court affirmed the trial court's decision to admit into evidence photographs showing bullet trajectory over the defendant's objection that such evidence was cumulative of the medical examiner's description and diagram of the wounds.  We held that the "photographs were admissible because they further illustrate the location and nature of [the victim's] wounds and provide additional support to the medical examiner's conclusion . . . ." Id.  In this case, the Commonwealth represented, without contradiction, that the photograph was "the best evidence that we have to explain" the findings of the examining physicians. Furthermore, Exhibit 130 was "very important" because it permitted the jury to "understand how the wounds in the child correspond with the wounds on the mother."  Just as the Commonwealth in Joseph was not required to rely on a description

and diagram of the victim's wounds, the Commonwealth could validly introduce a photograph of the victim showing bullet trajectory or a model of the victim's body for the same purpose. Thus, Exhibit 130 was properly admitted into evidence.

The trial court determined that Exhibit 136 was admissible because it corroborated Rashid's testimony that Shearyia had black marker on her face on the morning of the murders. A photograph may be admissible merely because it is "part of the facts of this particular case," Jackson, 267 Va. at 202, 590 S.E.2d at 534, or because it corroborates witness testimony. See Brown v. Commonwealth, 212 Va. 515, 519, 184 S.E.2d 786, 789 (1971), vacated on other grounds, 408 U.S. 940 (1972). The trial court therefore did not err in admitting Exhibit 136.

Exhibits 163 and 164 are photographs of firearms recovered from Juniper's residence during the execution of a search warrant by the Norfolk Police on April 27, 2001. Exhibit 165 is a stipulation of the facts regarding items found in the search, signed by Juniper and the Commonwealth's Attorney as part of Juniper's plea agreement on charges of possession of cocaine and possession of marijuana. Exhibits 163, 164, and 165 were introduced during the penalty phase of the trial. While admitting that this evidence was relevant, Juniper argued to the trial court any relevance was outweighed by the prejudicial

67

effect especially because the possession of firearms charges from that incident were nol prossed by the Commonwealth.

In argument on brief, Juniper names the exhibits relating to this assignment of error as Exhibits 162-64.

We do not consider any argument relating to the admissibility of Exhibit 162 as it was not included in any assignment of error. Rule 5:17(c). Neither do we consider if the trial court erred in admitting Exhibit 165 because that exhibit was never discussed on brief. Powell, 267 Va. at 135, 590 S.E.2d at 554 (failure to adequately brief assignment of error is considered a waiver.). We consider only Juniper's argument that the trial court erred in admitting Exhibits 163 and 164 into evidence. We find the trial court did not abuse its discretion in so doing.

Juniper argues that admitting these photographs resulted in prejudice to him that outweighed their probative value. He notes that the photographs depict weapons that were the subject of prior nol prossed charges, and "the weapon found was not the weapon used relating to the case at bar."

The trial court ruled the photographs of the guns admissible and agreed with the Commonwealth that they were "relevant to the issue of a propensity for violence . . . association with a firearm [and] future dangerousness." We find that the evidence supports the trial court's decision.

Therefore, the trial court did not abuse its discretion in admitting the photographs that are Exhibits 163 and 164. Furthermore, Juniper's argument that the photographs prejudicially refer to a weapon not associated with the crimes charged in the case at bar is made moot by his waiver of his assignment of error as to Exhibit 165, the stipulation of facts, which also mentions the weapons.

### c. Sufficiency of the Evidence

Juniper assigns error to the trial court's failure "to strike the Commonwealth's evidence as to guilt" on the ground that "the witness testimony of Renee Rashid, Keon Murray and Tyrone Mings was inherently incredible and not worthy of belief." To support this claim, Juniper cites the "substantial gap" in time "from the criminal act to when [Mings and Murray] notified the police of their alleged knowledge of the events." Juniper makes the same contention regarding Rashid's delay of ten days before contacting an attorney and the police regarding her knowledge of the crimes.

In addition, Juniper notes that Mings gave different versions of the events to the police and, if he had actually come upon Juniper "with a gun in his hand, and cocaine on his face with dead bodies in the room," could have been Juniper's fifth victim. Lastly, Juniper claims that the Commonwealth's case "was circumstantial in that the record is void of

eyewitnesses to the shooting." Thus, Juniper argues the totality of the evidence "plac[ing] Juniper at the scene and the time of the incident, is inherently incredible." We disagree.

Our oft-repeated statement regarding appellate review of witness testimony is, "[t]he trier of fact is the sole judge of the credibility of the witnesses, unless, as a matter of law, the testimony is inherently incredible." Walker v. Commonwealth, 258 Va. 54, 70-71, 515 S.E.2d 565, 575 (1999), cert. denied, 528 U.S. 1125 (2000) (citations omitted). To be "incredible," testimony "must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ." Cardwell v. Commonwealth, 209 Va. 412, 414, 164 S.E.2d 699, 701 (1968) (quoting Burke v. Scott, 192 Va. 16, 23, 63 S.E.2d 740, 744 (1951)).

The mere fact that a witness may have delayed in reporting knowledge of a case or given inconsistent statements during the investigation of a crime does not necessarily render the testimony unworthy of belief. This circumstance is appropriately weighed as part of the entire issue of witness credibility, which is left to the jury to determine. See Shelton v. Mullins, 207 Va. 17, 22, 147 S.E.2d 754, 757-58

(1966); Bradley v. Commonwealth, 196 Va. 1126, 1136, 86 S.E.2d 828, 834 (1955).

Rashid testified that she drove Juniper to Keshia's apartment and left that location without him on the morning of the crime. She also stated that she heard "booms" corresponding to the sound of gunshots as she left. After returning with Murray and Little John to pick up Juniper, Rashid observed that Juniper was carrying a pistol that matched the description of the gun that both Mings and Murray testified they saw Juniper carrying in Keshia's apartment.

Mings testified that he found the door to Keshia's apartment knocked in from the outside, which comports with the police officer's description of Keshia's door at the scene. Mings also testified that he saw Juniper inside the apartment and that Juniper had a powdery substance on his face. This testimony is consistent with Murray's testimony that Juniper had a powdery substance like cocaine on his face when Murray picked up Juniper from Keshia's apartment a short time after Mings saw Juniper.

Mings also testified that he saw Rueben and a young girl on the bed in the master bedroom. He further testified that Juniper told him that Keshia was on the floor "between the bed and the dresser." The positions of these victims are consistent

with their locations when the police first entered Keshia's apartment.

As noted, Murray's testimony contained several facts that supported the testimony of both Rashid and Mings. In addition, Murray's testimony that Juniper confessed to him that "[t]hey gone" and he "killed them," is supported by a second confession Juniper made to Ernest Smith while incarcerated at the Hampton Roads Regional Jail.

Having reviewed the entire testimony of Renee Rashid, Keon Murray, and Tyrone Mings, we conclude that their testimony is not inherently incredible. We next address Juniper's more general challenge to the sufficiency of the evidence and the jury's reliance on circumstantial evidence to support its verdict.

Circumstantial evidence of guilt presented to the jury "is as competent, and entitled to the same weight, as direct testimony if such evidence is sufficiently convincing." Chichester v. Commonwealth, 248 Va. 311, 329, 448 S.E.2d 638, 650 (1994), cert. denied, 513 U.S. 1166 (1995) (quoting Derr v. Commonwealth, 242 Va. 413, 424, 410 S.E.2d 662, 668 (1991)). Thus, "[w]hile no single piece of evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.' " Id., 448

S.E.2d at 650 (quoting Stamper v. Commonwealth, 220 Va. 260, 273, 257 S.E.2d 808, 818 (1979), cert. denied, 445 U.S. 972 (1980)).

In a challenge to the sufficiency of the evidence to sustain a verdict, the proof must be viewed in the light most favorable to the Commonwealth. Burns v. Commonwealth, 261 Va. at 337, 541 S.E.2d at 892. Much of the evidence has already been detailed above and was not limited to the testimony of Rashid, Murray, and Mings. As noted, Ernest Smith testified that Juniper confessed to him that he had killed the victims. Smith also stated that Juniper told him he killed the children because "he didn't want to leave any witnesses at the scene of the crime." In addition, the Commonwealth presented evidence that Juniper's DNA matched DNA found on the knife that was used to stab Keshia, and that Juniper's fingerprint also matched a print retrieved from the knife.

Considering all of this evidence, and the reasonable inferences that can be drawn from it, we conclude that the evidence is sufficient to support a verdict of guilt. We hold that the trial court did not err in denying Juniper's motion to strike the evidence.

## 2. JURY INSTRUCTION ISSUES

Juniper contends the "trial court erred by instructing the jury as to 'armed' burglary and not burglary." On brief, he

argues that the Commonwealth's evidence failed to prove "[a]n essential element of armed burglary," namely, "that [Juniper was] armed with a deadly weapon." It is further argued that "[e]ven if Juniper was the individual who kicked the door in, there is no evidence that he was armed with a weapon."

Juniper posits as the basis for his argument the proposition that Rashid's testimony was inherently incredible and not worthy of belief. To support this claim, Juniper cites Rashid's admission on cross-examination that she "didn't notice any bulges in [Juniper's] pants [or his] jacket . . . that suggested . . . that he had a gun . . . [o]r a box of bullets."

The Commonwealth responds by asserting that Juniper waived his right to appeal the jury instruction on armed burglary because he did not object to the instruction when it was given. Furthermore, the Commonwealth contends that "[t]o the extent that [Juniper] argues that the court should have granted his motion to strike as to armed burglary, this argument is redundant of the argument made in Assignment of Error 26."

The record establishes that Juniper made a motion to strike the indictment for armed burglary at the close of the Commonwealth's evidence, and he renewed the motion to strike at the close of all the evidence. As such, Juniper preserved his right to appeal the trial court's giving of instructions on the charge of armed burglary.

The record reflects that the jury was instructed as follows:

> The defendant is charged with the crime of burglary while armed. The Commonwealth must prove [four elements, the fourth being] [t]hat at the time of his entry he was armed with a deadly weapon.
>
> If you find the Commonwealth has proved all 4 [elements], you shall find the defendant guilty of burglary while armed.
>
> If you find the Commonwealth has proved all [elements] but #4, you shall find the defendant guilty of burglary.

This instruction is consistent with the trial court's statements at the time it rejected Juniper's motion to strike the charge of armed burglary. The trial court explained its decision:

> I don't find that any of the testimony heard is inherently incredible. I'll overrule the motions. I think certainly the jury would have to be instructed on the burglary charge for armed burglary as well as unarmed burglary. I think they could conclude from the evidence that no weapon was present at the time of entry, but they could also conclude that one was. It's a factual question they have to decide.

The armed burglary instruction properly set forth the legal definition of both armed burglary and the lesser-included offense of burglary. An instruction accurately stating the law is nonetheless improperly given if it is "inapplicable to the facts and circumstances of the case." Hatcher v. Commonwealth, 218 Va. 811, 813-14, 241 S.E.2d 756, 758 (1978). "An instruction must be supported by more than a scintilla of evidence." Id. at 814, 241 S.E.2d at 758.

75

As previously addressed in our discussion of the sufficiency of the evidence claim, admissible evidence was before the jury from Rashid, Murray, and Mings as to Juniper's possession of an automatic pistol at Keshia's apartment at the time of the crimes.  If so believed by the jury, this witness testimony was "more than a scintilla of evidence" necessary to support the armed burglary instruction.  None of the testimony was inherently incredible, and none of it reduced to a scintilla the amount of evidence indicating Juniper was armed with a deadly weapon upon entering Keshia's apartment.  The instruction appropriately left the factual determination of whether the Commonwealth had sufficiently proven the fourth element of the crime – that at the time of his entry Juniper was armed with a deadly weapon – to the jury.  We thus find no error in the trial court's decision to instruct the jury on armed burglary.

### D.    PENALTY PHASE

#### 1.    WITNESS TESTIMONY

##### a.    Notice of Unadjudicated Criminal Conduct

Juniper argues the trial court abused its discretion with regard to certain testimony of Malika Barnes about instances of his unadjudicated conduct because there was no specific notice given by the Commonwealth.  He assigns error to the admission of that testimony.

In accordance with Code § 19.2-264.3:2, the Commonwealth provided written notice to Juniper describing his unadjudicated acts of criminal conduct which the Commonwealth intended to present at the sentencing phase.  In accordance with the statute, the notice described each incident and gave the time and place such conduct was alleged to have occurred.  Juniper argues that the Commonwealth's notice was insufficient as to "the specific criminal acts, separate and distinct criminal acts" that allegedly occurred in two of the listed incidents.

First, Juniper contends that while Malika testified that in the spring of 2003, Juniper entered the food store where Keshia worked and pulled her by the arm, the corresponding notice stated as follows:

> 16.  At diverse times during the Spring of 2003 at the Tinee Giant . . . the defendant did threaten to do bodily harm to Keshia Stephens (indicating that he would beat her ass).

Second, Juniper alleges that Malika's testimony that in the Spring of 2003, at Juniper's mother's home, Juniper addressed Keshia as "bitch" and pulled her up out of a chair by her arm, did not correspond to the notice which stated as follows:

> 15.  During the Spring of 2003 at 1051 Kittrell Street in Norfolk, Virginia the defendant did assault and batter Keshia Stephens by grabbing her arm and forcefully pulling her out of a chair.

77

At trial, Juniper argued that the notice was insufficient because it did not allege Juniper physically assaulted Keshia at the food store, nor did it charge Juniper verbally berated her at his mother's home, as Malika testified.  He contends:

> [A] physical assault and curse and abuse are not the same offenses.  They are routinely charged as separate offenses when they're in lower court. . . . And if they are separate offenses [and] we are noticed as to a verbal assault and [this witness] start[s] talking about grabbing and kicking and hitting, then we have not been given notice. . . . Notice I believe . . . should tell us what the offense is.

The trial court addressed Juniper's argument as to only the food store incident, determining that a separate noticed incident[18] which alleged Juniper slapped Keshia, gave the defense sufficient notice of the assault allegation.

On appeal, the Commonwealth argues that because the noticed incidents advised Juniper of "two separate assaults that Spring at the Tinee Giant . . . [t]he trial court properly concluded that [Juniper] had fair notice of the Commonwealth's intent to prove . . . assault."  Furthermore, the Commonwealth contends that even if the notice was not sufficient to advise Juniper of the alleged incidents to which Malika testified, such error is

---

[18] The incident to which the trial court referred is as follows:

> 10.  During February or March 2003 at the Tinee Giant . . . the defendant did threaten Keshia Stephens by indicating "wait until you get off work" and physically assault Keshia Stephens by slapping her in the face.

harmless as Malika's testimony was merely cumulative of other incidents of assault by Juniper. We agree with the Commonwealth.

The notice advised Juniper of four separate incidents at the food store, which together alleged one incident of verbal abuse, three counts of threatening bodily harm, and two assaults on Keshia. Altogether, the Commonwealth noticed at least 11 assaults, four incidents of verbal abuse, and at least eight occasions of threatening bodily harm by Juniper against Keshia. With regard to the discrepancy between Malika's testimony and the food store incident, we agree with the trial court that the two other alleged assaults at the Tinee Giant were sufficient to notify Juniper of the unadjudicated assault conduct to which Malika testified. We also find that Malika's testimony that Juniper called Keshia a "bitch" at his mother's house is merely cumulative of the other incidents of alleged verbal abuse.

### b. Testimony of Rueben Harrison, Sr.

Juniper contends the trial court "erred in refusing to allow Juniper to call witness Rueben Harrison, Sr. [the father of one of the decedents] regarding the imposition of the death penalty." Juniper asked the trial court to permit Harrison, Sr. to testify about remarks attributed to him by the news media to the effect "that as a Christian he cannot hope that jurors

impose the death penalty."  The trial court denied Juniper's request.

Juniper argues that Harrison, Sr.'s testimony should have been permitted because he was the father of one of the victims, and thus a "victim" permitted to testify under Code § 19.2-264.4 and Code § 19.2-11.01.  Furthermore, Juniper contends the testimony Harrison, Sr. would have given was relevant under Code § 19.2-299.1(vi), which permits victim impact testimony that "provide[s] such other information as the court may require related to the impact of the offense upon the victim."

The Commonwealth responds that Harrison, Sr.'s potential testimony does not fall within the scope of victim impact testimony authorized under Code § 19.2-299.1 and is not relevant to the ultimate decision of sentence, which is the sole province of the jury.  We agree with the Commonwealth.

The opinion of Harrison, Sr. as to the appropriate sentence for Juniper is not an item encompassed within Code § 19.2-229.1(i) through (vi),[19] which sets forth the only factors about

---

[19] Code § 19.2-299.1 states, in relevant part:
A Victim Impact Statement . . . shall (i) identify the victim, (ii) itemize any economic loss suffered by the victim as a result of the offense, (iii) identify the nature and extent of any physical or psychological injury suffered by the victim as a result of the offense, (iv) detail any change in the victim's personal welfare, lifestyle or familial relationships as a result of the offense, (v) identify any request for psychological or medical services initiated by the

which testimony by a victim are permitted.  See Code § 19.2-264.4(A1).

More importantly, witness opinion on what the jury should decide as the appropriate sentence in a given case is not admissible.  It is irrelevant to the sentencing decision, which is only for the jury to make.  A victim called as a witness by the Commonwealth would clearly not be permitted to opine as to his or her preferred sentence for the defendant.  Payne v. Tennessee, 501 U.S. 808, 830 n.2 (1991) ("Booth [v. Maryland] also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment."); Booth v. Maryland, 482 U.S. 496, 508-09 (1987) ("The admission of these emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases."); see also Humphries v. Ozmint, 397 F.3d 206, 217 (4th Cir. 2005) ("[T]he Payne Court did not alter Booth's holding that admitting evidence of the victims' opinions of the crime and of the appropriate sentence for the defendant violates the Eighth Amendment . . . .").

---

victim or the victim's family as a result of the offense, and (vi) provide such other information as the court may require related to the impact of the offense upon the victim.

The trial court did not err in excluding the requested testimony of Rueben Harrison, Sr.

### c.   Dr. Pasquale's Testimony

Juniper posits two assignments of error regarding the trial court's refusal to permit certain testimony by Juniper's mental health expert, Dr. Thomas Pasquale.  Initially, Juniper contends the trial court wrongfully excluded Dr. Pasquale's testimony as to Juniper's impulsiveness.  Second, he argues the trial court erred in not permitting Dr. Pasquale to testify regarding Juniper's risk assessment related to his future dangerousness in the context of a prison environment.

### i. Impulsiveness

Juniper first maintains that Dr. Pasquale's testimony about impulsiveness did not, as the Commonwealth alleges, relate to premeditation which had been decided at the guilt phase. Rather, Juniper contends Dr. Pasquale testified to "his overall opinion that Defendant is an impulsive person and is possessed of an impulsive character."  He argues that Dr. Pasquale did not testify that Juniper's "actions with regard to the murder were an impulsive act."  We disagree.

Prior to the Commonwealth's objection, Dr. Pasquale made references to impulsiveness, which he described as a trait of the preadolescent stage of development, an indicator of

characterological disfunction, and a characteristic of anti-social behavior, all of which he said applied to Juniper. However, defense counsel, near the end of his examination of Dr. Pasquale, moved from questions regarding a general evaluation of Juniper to Dr. Pasquale's opinion as to influences upon Juniper at the time of the offense.

> Q:   Now, I want to direct your attention more specifically to the issues before us in this case.
> Specifically, sir, and I'm referring you to page ten of your report.  Would you address the issue of . . . whether you have an opinion as to whether or not Mr. Juniper acted under extreme mental or emotional disturbance at the time of the offense?
>
> A:   What I had stated [in my report] are three questions that are being asked in reference to issues relevant to mitigation and risk.  The first one [was] did this person have a lot of stress, mental, emotional disturbance at the time of offense.
> And I said [in my report] that . . . he was in a highly emotional, abusive and troubling relationship with Ms. Stephens over a period of many months; that when you combine his attachment problems, his rage reactions, his need to control with a person that he's embroiled with, that a foundation for violence becomes built.
> Now, I went on to look at something else as well. . . . [T]hat . . . the issue of premeditated aggression may be questioned in contrast to an act of impulsivity.
>
> Q:   Explain that if you would, Dr. Pasquale.
>
> A:   Well, it's the notion of how do I view Mr. Juniper behaving violently, being aggressive.  And . . . my interpretation was that he was a very impulsive person who might not put a lot of thought at all into doing something.

(Emphasis added).

The Commonwealth then objected, arguing that "[premeditation] has already been resolved with the guilt phase." Juniper responded that Dr. Pasquale was not "testifying that [Juniper] lacked premeditation, but perhaps just putting it in context of the impulsivity that Dr. Pasquale has already testified to,[20] not that there was an absence of [premeditation] in context."

Dr. Pasquale testified that there was a difference between "premeditated aggression" and an "act of impulsivity." However, any contrast between Juniper's alleged mental state at the time of the crime and the required element of premeditation is applicable only as it relates to Juniper's culpability, not his sentence. We agree with the Commonwealth that Dr. Pasquale's testimony on this point would have been properly admissible only if Juniper were advancing a defense based upon mental disease or disorder in the guilt phase, which he did not. See generally, Dandridge, 267 Va. at 596-97, 594 S.E.2d at 581-82; Bailey v.

---

[20] On brief, Juniper argues that "Dr. Pasquale had already testified as to Defendant's impulsivity, without objection from the Commonwealth, when testifying with regard to Defendant's anti-social thought and behavioral patterns." To the extent Juniper intends the Commonwealth had waived its objections to Dr. Pasquale's later testimony, he is incorrect. Pasquale's prior testimony regarding impulsiveness as a general characteristic is substantially different from his later testimony that Juniper was affected by impulsivity at the time of the offense. Thus, we find that the Commonwealth did not waive its right to object to Dr. Pasquale's impulsiveness

Commonwealth, 259 Va. 723, 734, 529 S.E.2d 570, 576, cert. denied, 531 U.S. 995 (2000).

The trial court ruled that Dr. Pasquale could not "render opinions on premeditation during the commission of the offenses." We agree. The trial court's exclusion of Dr. Pasquale's impulsiveness testimony regarding Juniper's state of mind at the time of the offense was not erroneous.

### ii. Risk Assessment

Citing no case authority in the trial court or on appeal, Juniper contends the trial court abused its discretion when it refused to permit "Dr. Thomas Pasquale to testify regarding Juniper's risk assessment related to his future dangerousness." This claim of error goes to the trial court's prohibition of proffered testimony from Dr. Pasquale, Juniper's court appointed psychologist, that Juniper's risk assessment for future dangerousness was different in a prison setting from that in an "open community."

Juniper asked the trial court "to allow Dr. Pasquale to give his opinion on [Juniper's] future dangerousness in the penitentiary." The Commonwealth had objected to this line of questioning arguing that "the question is in general terms would the defendant exhibit violent conduct in the future as opposed

testimony as it related to Juniper's mental state at the time of the murders.

85

to the question of <u>could</u>." (Emphasis added.) Counsel argued the issue and Dr. Pasquale was examined by both parties and the trial court outside the presence of the jury.

Juniper represented that Dr. Pasquale would testify "there is a difference in risk assessment which is to say future dangerousness or the prediction of future dangerousness in an open community such as the one we live in and in a prison environment such as the one Mr. Juniper will live in." The trial court responded by noting that "I would think the jurors could determine that without the need of expert testimony. I think common sense would tell people that." The Commonwealth argued that in the context of future dangerousness "whatever is said by [the] expert has to refer to the character of the defendant, not the character of the prison or anything else."

In response to voir dire, Dr. Pasquale explained that his assessment of a defendant to evaluate future dangerousness would involve a number of factors. "[W]hen you do the actuarial for the open community, you're asking about the person. Did they live with their biological parents? How did they go to school? Do they have a personality disorder?" However, Dr. Pasquale then explained that "[t]here have only been two variables that I have described that have been shown to demonstrate some issue about workability in prison[:] age and past performance in incarceration."

86

While Juniper agreed he could not offer evidence on general prison conditions, he did not proffer from Dr. Pasquale or otherwise that there would be any testimony about how Juniper's personal and specific characteristics would be reflected in his ability to adapt in prison or whether there was any past incarceration performance to evaluate. Instead, Dr. Pasquale acknowledged his "ultimate testimony is that . . . there is less risk of the defendant acting out violently in prison than it would be the defendant acting out violently in the open community." Upon completion of counsels' arguments and the examination of Dr. Pasquale, and still outside the presence of the jury, Juniper made a proffer of Dr. Pasquale's proposed testimony.

> [DEFENSE COUNSEL]: If I [were] to ask you the question and if the Court were to allow it, your opinion would be that his risk assessment in the open community is high and his risk assessment in the prison setting is low to moderate?
>
> [DR. PASQUALE]: Yes.

The trial court then later permitted Juniper's counsel to ask Dr. Pasquale this question in the presence of the jury:

> [DEFENSE COUNSEL]: In your opinion is the risk assessment of Mr. Juniper's future dangerousness dependent on or related to the circumstances of his environment?
>
> [DR. PASQUALE]: Yes.

However, the trial court did not allow any broader testimony from Dr. Pasquale on the subject of future dangerousness in a prison environment including the proffered question. In rejecting Juniper's request, the trial court observed "a determination of future dangerousness revolves around an individual defendant and a specific crime." We do not find error in the trial court's ruling.

We have held in our prior decisions that "what a person may expect in the penal system is not relevant mitigation evidence." Cherrix v. Commonwealth, 257 Va. 292, 310, 513 S.E.2d 642, 653, cert. denied, 528 U.S. 873 (1999) (internal quotation marks omitted); see also Walker, 258 Va. at 70, 515 S.E.2d at 574. We have also been plain in establishing threshold requirements of relevance for the admission of evidence in mitigation particularly as it relates to the statutory factor of future dangerousness: such evidence should "concern the history or experience of the defendant." Cherrix, 257 Va. at 310, 513 S.E.2d at 653; see also Burns, 261 Va. at 340, 541 S.E.2d at 893-94.

In Burns, we further delineated this concept while rejecting Burns' claim seeking evidence on "daily inmate routine, general prison conditions." Id. at 338, 541 S.E.2d at 892.

> Burns wanted to show, in rebuttal to the Commonwealth's evidence of his future dangerousness, that his opportunities to commit criminal acts of violence in the future would be severely limited in a maximum security prison. However, in Cherrix, we reiterated the principle that the United States Constitution "does not limit 'the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.' " Cherrix, 257 Va. at 309, 513 S.E.2d at 653 (quoting Lockett v. Ohio, 438 U.S. 586, 605 n.12 (1978)). Thus, the relevant inquiry is not whether Burns could commit criminal acts of violence in the future but whether he would. Indeed, Code §§ 19.2-264.2 and –264.4(C) use the phrase "would commit criminal acts of violence." Accordingly, the focus must be on the particular facts of Burns' history and background, and the circumstances of his offense. In other words, a determination of future dangerousness revolves around an individual defendant and a specific crime. . . .
>
> Unlike the evidence proffered by Burns, the evidence in Skipper [v. South Carolina, 476 U.S. 1, 4 (1986)] was peculiar to that defendant's history and background.

Id. at 339-40, 541 S.E.2d 893-94.

In Bell, 264 Va. at 201, 563 S.E.2d at 714, we re-emphasized the necessity that relevant mitigating evidence on the issue of future dangerousness must be based on the specific characteristics of the defendant. In that context, evidence relating to a prison environment must connect the specific characteristics of the particular defendant to his future adaptability in that environment in order to be heard by the jury. It must be "evidence peculiar to a defendant's character,

history and background" in order to be "relevant to the future dangerousness inquiry . . ." <u>Id</u>. We further observed that

> [t]he testimony that Bell sought to introduce through the expert concerned the conditions of prison life and the kind of security features utilized in a maximum security facility. That is the same kind of evidence that we have previously rejected as not relevant to the future dangerousness inquiry. . . . Nor is such general evidence, not specific to Bell, relevant to his "future adaptability" or as a foundation for an expert opinion on that issue.

<u>Id</u>.

The proffer of Dr. Pasquale's testimony on future dangerousness in a prison setting fails to meet the test of relevance established in our prior cases. Neither the actual proffer, counsel's argument, nor Dr. Pasquale's explanations on voir dire tie his proposed opinion testimony on future dangerousness in a prison environment to Juniper's "history and background, and the circumstances of his offense," <u>Burns</u>, 261 Va. at 340, 541 S.E.2d at 893, to Juniper's "character, history and background" or was "specific to [Juniper], relevant to his 'future adaptability.'" <u>Bell</u>, 264 Va. at 201, 563 S.E.2d at 714. While Dr. Pasquale may not have sought to offer specific evidence on a day in the life of a prisoner, as in <u>Cherrix</u>, he offered nothing to the trial court to support his opinion as being based on Juniper's individual characteristics that would

affect his future adaptability in prison and thus relate to a defendant-specific assessment of future dangerousness.[21]

The burden rested upon Juniper, as the proponent of Dr. Pasquale's testimony, to make a threshold showing, in conformity with Bell and Burns, that an assessment of future dangerousness was grounded on Juniper's specific characteristics in the context of his future adaptability in a prison setting. See Commonwealth v. Sanchez, 268 Va. 161, 165, 597 S.E.2d 197, 199 (2004) (party offering expert testimony must make proper proffer of testimony's admissibility). Juniper failed to carry that burden. The trial court thus correctly barred Dr. Pasquale's generalized testimony and did not abuse its discretion in doing so.

### 2.    REJECTED PENALTY PHASE INSTRUCTIONS

Juniper contends the trial court erred "by disallowing Juniper's proposed instructions in the penalty phase regarding depravity of mind, aggravated battery, and mitigating evidence." The three rejected instructions are:

(Def. A)    In deciding whether the Commonwealth has proven that the defendant's conduct was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind, you are instructed that depravity of mind is not proven by proof of

---

[21] There was no issue in the case at bar, as existed in Skipper, 476 U.S. 1, as to evidence concerning Juniper's actual adaptation to confinement while awaiting trial. This subject was never mentioned at trial, and no contention is made in that regard by Juniper.

an intentional killing.  Rather, depravity of mind means a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary malic[e] and premeditation.  Ordinary malice is that state of mind which results in the intentional doing of a wrongful act to another without legal justification or excuse, at a time when the mind of the actor is under the control of reason. Ordinary premeditation is a specific intent to kill, adopted at some time before the killing, but which need not exist for any particular length of time.

(Def. B)  In deciding whether the Commonwealth has proven that the defendant's conduct was outrageously vile, horrible or inhuman in that it involved an aggravated battery to the victim, you are instructed that an aggravated battery is not proven by proof of an intentional killing. Rather, an aggravated battery is a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder.  A battery is the actual infliction of corporal hurt on another.  A battery which causes death is a murder, but that fact, standing alone, does not make the battery an aggravated battery.

(Def. C)  If you unanimously find that the Commonwealth has proved an aggravating circumstance beyond a reasonable doubt, you must go on to consider mitigating evidence.  Mitigating evidence is any fact or circumstance that, while it does not excuse or justify the offense, nonetheless in fairness and mercy may either extenuate or explain it or reduce the degree of the defendant's moral culpability such that he should not be sentenced to death.

     Certain factors, if they exist, are made mitigating by law.  In this case, they are:

1.  That the defendant has no significant history of prior criminal activity.

2. That the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

3. At the time of the commission of the capital felony, the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was significantly impaired.

You must consider the evidence bearing on each of these factors. Each of you must then decide, individually, whether you find that the factor exists. If you, individually, find that any of these factors does exist, that factor is mitigating and you must consider it in deciding upon sentence.

Other factors, if they exist, may be mitigating. You must consider all of the evidence offered in mitigation. Each of you must then decide, individually, whether the evidence establishes the existence of any other factor and whether that factor is mitigating. If you, individually, find that a factor exists and that it is mitigating, you must consider it in deciding sentence.

In refusing the proposed instructions, the trial court stated, "I think other instructions that are being given adequately cover the subject instructions."

Juniper asserts that because each proposed instruction accurately states the law and substantially tracks either model jury instructions or instructions used in other cases, the trial court should have given his proposed instructions. He also contends that giving a jury instruction regarding aggravating and mitigating circumstances without also instructing the jurors

that the mitigating circumstances need not be unanimously found is unconstitutional.[22]

The Commonwealth responds by asserting that the proposed instructions were "cumulative" and "redundant" of instructions given to the jury. Specifically, the Commonwealth notes the substantially similar, and in cases identical, text in the following instructions given by the trial court:

 (1) "Depravity of Mind" means a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation.

 (2) An "aggravated battery" is a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder.

 (3) If you find that the Commonwealth has proved beyond a reasonable doubt the existence of an aggravating circumstance, in determining the appropriate punishment, you should consider any evidence presented of circumstances which do not justify or excuse the offense but which in fairness or mercy may extenuate or reduce the degree of moral culpability and punishment.

To the degree that the proposed instructions differed from those actually given, the Commonwealth argues that the proposed instructions would have impermissibly confused or misled the jury, suggested a particular response from the jury, or provided an incorrect statement of the law. "Def. A," the proposed

---

[22] Juniper apparently refers to Instruction CS-7 given by the trial court, but he fails to identify the specific instruction.

94

instruction on depravity of mind, for example, included instructions on malice and premeditation, which are not relevant for consideration in the sentencing phase of the trial. Similarly, "Def. B," the proposed instruction on aggravated battery, "suggest[ed] resolution of the question in [Juniper's] favor." As to proposed instruction "Def. C," the Commonwealth argued this would mislead the jury because it suggested the listed mitigating factors had been determined to exist by the trial judge, which was not the case.

After comparing the proposed instructions to those actually given, we find that the trial court did not abuse its discretion in refusing Juniper's proposed instructions. The language relevant and appropriate to Juniper's case was "fully and fairly" covered by the instructions given to the jury. Instruction "Def. A" regarding malice and premeditation was superfluous and potentially confusing to the jury at the penalty stage because those factors are only at issue during the guilt phase of the trial. The depravity of mind instruction that was given contained sufficient information for the jurors to understand that term. Similarly, the jury was adequately instructed on what constitutes aggravated battery. The additional information contained in the proposed instruction "Def. B" was unnecessary and suggestive.

With regard to Juniper's proposed instruction "Def. C," we agree with the Commonwealth that the wording of the instruction would have misled the jury as to the existence of the listed mitigating factors because it implied that such factors had been established.  That determination was the responsibility of the jury.  Furthermore, we have previously rejected "the argument that the jury should have been instructed its finding of mitigating factors need not be unanimous" as being "unnecessary" and "confusing."  Clark v. Commonwealth, 220 Va. 201, 212, 257 S.E.2d 784, 791 (1979), cert. denied, 444 U.S. 1049 (1980).  "Since only by unanimous agreement can the death penalty be inflicted, a disagreement by one or more of the jurors as to the proper sentence would, by statute, result in life imprisonment.  Code § 19.2-264.4(E)."  Id.  The differences between aggravating and mitigating factors, and their role in determining a sentence of death versus imprisonment for life, were sufficiently covered by the instructions given to the jurors by the trial court.

Our previous decisions reflect that even if jury instructions contain accurate statements of law, a trial court does not abuse its discretion by refusing the instruction if it "is not applicable to the facts and circumstances of the case," Hatcher, 218 Va. at 813-14, 241 S.E.2d at 758, or if it "would have created confusion and would have been misleading."  Hubbard v. Commonwealth, 243 Va. 1, 15, 413 S.E.2d 875, 883 (1992).  Nor

96

does a trial court abuse its discretion by refusing a relevant instruction if the "granted instructions fully and fairly cover" the same legal principle. Stockton, 227 Va. at 145, 314 S.E.2d at 384. The trial court thus did not err in refusing Juniper's proposed instructions.

### E.   STATUTORY REVIEW UNDER CODE § 17.1-313

Juniper's initial assignments of error are that the sentence of death (1) "was imposed under the influence of passion, prejudice or other arbitrary factor" and (2) "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant." These assignments of error track nearly verbatim the mandatory review of a sentence of death which this Court must undertake under Code § 17.1-313(C)(1) and (2). Accordingly, we consider Juniper's assignments of error and our statutory review together.

### 1.   CODE § 17.1-313(C)(1): PASSION, PREJUDICE OR OTHER ARBITRARY FACTOR

Juniper argues that the imposition of his death sentence demonstrates that the jury and trial court "were swept away on a tide of passion, prejudice and other arbitrary factors," but cites no evidence from the record to support his contention. Juniper's failure to make a "particularized argument that the jury's verdict was not the product of a reasoned and

97

dispassionate deliberation" is not dispositive because of our statutory mandate to review his sentence. Elliott, 267 Va. at 429, 593 S.E.2d at 291. We have completed that review of the record and find no basis to conclude that the jury or trial court were influenced by passion, prejudice or other arbitrary factor in sentencing Juniper to death.

### 2. CODE § 17.1-313(C)(2): EXCESSIVE OR DISPROPORTIONATE SENTENCE

We must also determine whether the death sentence imposed upon Juniper is "excessive or disproportionate to the penalty imposed in similar cases." Code § 17.1-313(C)(2). Juniper's argument on this issue is again conclusory and without reference to any particular reason his sentence is excessive or disproportionate. That failure on Juniper's part does not affect our own proportionality review required by statute.

We do not conduct a proportionality review to "insure complete symmetry among all death penalty cases." Muhammad, 269 Va. at 532, 619 S.E.2d at 63 (quoting Orbe, 258 Va. at 405, 519 S.E.2d at 817). Nor do we seek to "understand why the trier of fact imposed the sentence of life" rather than a sentence of death. Lewis v. Commonwealth, 267 Va. 302, 312, 593 S.E.2d 220, 226, cert. denied, 543 U.S. 904 (2004). Our review is to "identify and invalidate the aberrant death sentence." Muhammad, 269 Va. at 532, 619 S.E.2d at 63 (quoting Orbe, 258

98

Va. at 405, 519 S.E.2d at 817).  We find no aberration in the case at bar.

In conducting the proportionality review, we must determine whether "other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant."  Lovitt, 260 Va. at 518, 537 S.E.2d at 880 (quoting Johnson, 259 Va. at 683, 529 S.E.2d at 786).  We have taken into account the circumstances of the crimes and of Juniper.  We have compared the record in the case at bar with the records of other capital murder cases, including those in which a sentence of life imprisonment was imposed, pursuant to Code § 17.1-313(E).  In particular, we have reviewed capital murder cases where a defendant killed more than one person as part of the same act or transaction, Code § 18.2-31(7), and cases where a person age twenty-one or older killed a person under the age of 14, Code § 18.2-31(12), and where the sentence of death was imposed based upon the aggravating factors of vileness and future dangerousness. See, e.g., Zirkle v. Commonwealth, 262 Va. 631, 553 S.E.2d 601 (2001) (capital murder of two persons, one of whom was under age of 14 by person age 21 or older); Bramblett v. Commonwealth, 257 Va. 263, 513 S.E.2d 400, cert. denied, 528 U.S. 952 (1999) (capital murder of family of four, including two children under age of 14); Stewart v. Commonwealth, 245 Va. 222, 427 S.E.2d 394, cert. denied, 510

99

U.S. 848 (1993) (capital murder of more than one person, including wife and infant son); Goins, 251 Va. 442, 470 S.E.2d 114 (capital murder of family of five, including three children under age of 14).  In each of those cases, this Court affirmed the sentences of death.[23]  Upon review, we conclude that Juniper's sentence of death was not excessive or disproportionate to the sentences imposed by other sentencing bodies in the Commonwealth in comparable cases with comparable defendants.

### III. CONCLUSION

Upon review of the record and upon consideration of the arguments presented, we find no reversible error in the judgment of the trial court.  Furthermore, we find no reason to commute or set aside the sentences of death.  We will affirm the judgment of the trial court.

Affirmed.

---

[23] These cases are cited as examples, but "our proportionality analysis encompasses all capital murder cases presented to this Court for review and is not limited to these selected cases."  Burns, 261 Va. at 345, 541 S.E.2d at 896-97 (internal quotation mark omitted).