COURT OF APPEALS OF VIRGINIA

Present:  Judges Humphreys, Huff and Lorish
Argued at Norfolk, Virginia

UNPUBLISHED

RONALD JAMES WILLIAMS, JR.

v.      Record No. 0373-22-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE LISA M. LORISH
JUNE 13, 2023

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Randall D. Smith, Judge Designate[1]

Michelle C.F. Derrico, Senior Appellate Attorney (Virginia Indigent
Defense Commission, on briefs), for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Ronald James Williams, Jr. ("Williams") appeals from his convictions for forcible sodomy

of a child under thirteen while Williams was over the age of eighteen, two counts of indecent

liberties with a child under fifteen, and two counts of aggravated sexual battery.  Williams contends

that the trial court erroneously admitted a video depicting the child victim's forensic interview and a

letter disclosing her alleged sexual abuse under Code § 19.2-268.3, which creates a hearsay

exception for specific statements by child victims of certain crimes.  Williams also argues that the

evidence was insufficient to sustain his convictions because the victim's testimony was inherently

incredible.  Finally, Williams asserts that the trial court's imposition of the mandatory life sentence

---

[*] This opinion is not designated for publication.  See Code § 17.1-413.

[1] Judge Randall D. Smith presided at the jury trial and entered the final sentencing order
in this matter.  Judge Rufus A. Banks, Jr., presided at the hearing on the Commonwealth's
motion in limine to admit the child victim's out-of-court statements under Code § 19.2-268.3.

for the forcible sodomy conviction violated the Eight Amendment's prohibition against cruel and unusual punishment. We affirm the trial court's judgment.

BACKGROUND[2]

In the summer of 2017, twenty-nine-year-old Williams lived in an apartment with his partner, Francine Williams ("Francine"), and their four children. The family included Williams's and Francine's daughter K.W., who was then ten years old, and her sister, who was eleven years old. Williams or another relative would watch the children at the apartment while Francine worked twelve-hour shifts. Williams continued to reside with his family until late December 2017, when he was incarcerated for an unrelated offense.[3] Francine and the children moved to a new residence soon after.

In April or May 2018, while Williams was incarcerated, K.W.'s sister texted Francine a photograph of a letter K.W. had written alleging that Williams had sexually abused her.[4] Francine told Williams's probation officer about the letter but did not report K.W.'s alleged abuse to police because Francine had an outstanding arrest warrant and feared losing custody of her children.

On September 27, 2018, Jenna Spagnuolo conducted a video-recorded forensic interview of K.W. regarding her alleged abuse. K.W. told Spagnuolo that when she was ten years old,

---

[2] On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

[3] The record does not reflect the circumstances of Williams's incarceration.

[4] The letter stated, "I don't know if I already told you but did I ever tell you that daddy always use to sexual harase [sic] or however you say it but have I told you that daddy . . . . Never mind." The letter also stated that Williams "[a]lways touch my behind"; "[t]ells me to touch his dingaling"; and "forced me to suck his dingaling." Finally, the letter stated, "[T]hat's why sometimes I don't love him and sometimes I am actually happy that he is in jail so he won't do them things to me."

Williams "sexually harass[ed]" her multiple times at her apartment while her mother was at work. K.W. said that Williams would "touch" and "rub[]" her "behind" with his hand and tell her to "suck [his] dingaling." Once, Williams took her to his bedroom, and ordered her to rub his penis through his clothing; when she refused, he grabbed her hand and forced her to do so. Another time, Williams forced her to fellate him by grabbing her head and moving her mouth "back and forth" on his penis. During the interview, K.W. confirmed the allegations contained in her letter to her sister, which she read aloud at Spagnuolo's request. K.W. also said that her siblings were present during one incident when Williams touched her buttocks.

On March 5, 2019, a grand jury indicted Williams for forcible sodomy of a child under thirteen while he was over the age of eighteen, two counts of indecent liberties with a child under fifteen, and two counts of aggravated sexual battery. Before trial, the Commonwealth moved to admit K.W.'s letter and the video of her forensic interview under Code § 19.2-268.3. Qualified "as an expert in child forensic interviews and child abuse," Spagnuolo testified at a hearing on the motion that she conducted K.W.'s forensic interview in "a neutral setting" and followed "nationally recognized protocols and evidence-based research" in doing so. Before the interview, Spagnuolo made "no determination as to what happen[ed] next with the investigation." Spagnuolo testified that K.W. responded to questions in an "age-appropriate manner" and did not seem "scared" during the interview, although K.W. became "tearful" when she discussed her abuse. Spagnuolo authenticated a copy of the forensic interview video and, without objection, the Commonwealth played a portion of it for the trial court.[5]

During argument on the Commonwealth's motion, Williams asserted that the forensic interview video would be "more prejudicial than probative and cumulative" of K.W.'s

_____

[5] At the hearing on the motion *in limine*, the Commonwealth did not introduce the forensic interview video as a formal exhibit, and the record is ambiguous as to exactly what portions of the video the trial court reviewed.

anticipated testimony at trial. Acknowledging that K.W. could "identify the written statement" and "identify herself in the video," Williams argued that "it would be more appropriate to hear directly from [K.W.]" regarding those statements. He also argued K.W.'s in-person testimony was necessary to satisfy Williams's "right to confront and cross-examine the witness against him." Williams did not object to admission of the letter.

Expressly considering the factors enumerated in Code § 19.2-268.3, the trial court found that K.W. had "personal knowledge of the event" because "she is the victim." The trial court further found that "[t]he letter that [K.W.] authored to her sister, the recorded interview would support the finding of credibility." Continuing, the trial court found that K.W. "did not have any motive to falsify or distort the events," the forensic interview "provide[d] sufficient safeguards against any bias or coercion," Williams had an "opportunity" to commit the alleged acts of abuse "while the mother was at work," and "[i]t appears from the interview that [K.W.] did not suffer from any pain or distress in making her statements." Therefore, the trial court concluded that "the time, content, and totality of the circumstances surrounding the *statement* supplies sufficient indicia of reliability so as to render it inherently trustworthy." (Emphasis added). The trial court also found that the Confrontation Clause would be satisfied because K.W. would testify at trial. It thus ruled that *both* the forensic interview video and letter were admissible.

At trial, K.W. testified that she told the truth during the forensic interview.[6] She said that in 2017, Williams began molesting her by rubbing her "butt" while her mother was at work. Later that summer, Williams began to ask K.W. to touch him sexually. K.W. testified that he would wake her up in the morning, take her into his room, close the door, and threaten her, "Don't tell nobody." Williams would then "[g]rab [her] wrist" and force her to "rub" his penis

---

[6] The Commonwealth introduced the forensic interview video and letter into evidence at trial.

by placing her hand on top of the groin area of his pants. K.W. testified that Williams made her do this multiple times and, when she did so, his penis felt "hard."

K.W. testified that Williams became progressively more abusive, at one point exposing his "private part" and placing it into her mouth.[7] As Williams pushed her head "back and forth," K.W. felt Williams insert his penis past her lips and teeth. Williams eventually stopped and K.W. "spit it out and ran to [her] room." Williams later asked her to do "it" again, but she refused.

K.W. testified that after Williams was incarcerated and her family moved to a new residence, she wrote the letter disclosing her abuse for the first time because she was "tired of holding it in" and had feared upsetting Williams while they lived together. K.W. acknowledged that one time when Williams had touched her "behind," they were in her brother's room and her brothers were also present. That said, she maintained that she loved Williams and said she wished she did not have to be on the stand and testify.[8]

Denying K.W.'s allegations, Williams testified[9] that he had a "wonderful" relationship with his children and did not know why K.W. had accused him of sexually abusing her. Williams claimed that Francine first informed him of the alleged abuse during a phone conversation while he was incarcerated after his arrest in December 2017. He also acknowledged that he called K.W. "from jail" and said, "I'm sorry," but maintained that he did

---

[7] She asked to write down a more specific word rather than say it aloud and wrote down "penis" on a sheet of paper, which the Commonwealth introduced as an exhibit.

[8] At the conclusion of the Commonwealth's evidence, the trial court denied Williams's motion to strike the charges. After the defense presented its case-in-chief, the trial court denied Williams's renewed motion to strike, which he argued on the same grounds.

[9] Williams acknowledged his criminal record comprising two felonies and two misdemeanors involving crimes of moral turpitude.

so because he regretted "being away from her for two years," not because he had sexually assaulted her.[10]

The jury found Williams guilty of each charge.  During sentencing deliberations, the jury asked, "Can we request that the sentence run at the same time?  Concurrently[.]"  After discussing the matter with counsel, the trial court, without objection, advised the jury,

> You should impose such punishment as you feel is just under the
> evidence that you've heard and within the instructions of the
> Court, and so having said that, you have to follow the instructions.
> I will file this and understand that your question was for what it
> was worth and take that into consideration at the appropriate time.

The jury then recommended that the trial court impose a sentence of life plus four years' imprisonment.

At the later sentencing hearing, Williams moved to set aside the jury's verdict.  He contended that the evidence was insufficient to prove the charges because inconsistencies in K.W.'s account, her delay in reporting the allegations, and the lack of corroboration rendered her testimony inherently incredible.  Williams also argued that the jury's recommended sentence of mandatory life imprisonment for the sodomy conviction was "cruel and unusual punishment" because "it does not allow any room for rehabilitation" and "sends a message that . . . this one particular offense is more serious than killing somebody."  The trial court found that the jury had watched the forensic interview video and heard the forensic interviewer's expert testimony, which corroborated K.W.'s testimony.  In addition, the trial court found that the General Assembly had "removed" the trial court's "discretion . . . to impose anything other than the

---

[10] At trial, the Commonwealth played a portion of an audio recording of the "jail call" during which Williams apologized to K.W. but did not introduce it as a formal exhibit.

mandatory minimum sentence."[11]  Therefore, the trial court denied the motion and sentenced Williams in accordance with the jury's verdict.  Williams appeals.

## ANALYSIS

### I.  Admissibility Challenges under Code § 19.2-268.3

Williams argues that the trial court erred in admitting the forensic interview video and K.W.'s letter under Code § 19.2-268.3 because Spagnuolo "tainted" the forensic interview by "coach[ing]" K.W.'s statements and the trial court failed to make statutorily-mandated factual "findings regarding the letter prior to its admission."  We agree with the Commonwealth that Williams has not preserved these arguments for appellate review.

Under Rule 5A:18, "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."  "The purpose of th[e] contemporaneous objection requirement [in Rule 5A:18] is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015).  Accordingly, "this Court 'will not consider an argument on appeal [that] was not presented to the trial court.'" *Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004) (alteration in original) (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998)), *aff'd*, 270 Va. 1 (2005).  If a party fails to timely and specifically object, he waives his argument on appeal. *Arrington v. Commonwealth*, 53 Va. App. 635, 641 (2009).

---

[11] Under Code § 18.2-67.1(B)(2), upon conviction of sodomy of a victim less than thirteen years of age while the perpetrator is eighteen years of age or older, "the punishment shall include a mandatory minimum term of confinement for life" that "shall be served consecutively with any other sentence."

During the hearing on the Commonwealth's motion to admit the forensic interview and the letter, Williams argued only that the video was "more prejudicial than probative and cumulative" of K.W.'s expected testimony, that its admission would violate his right to confrontation, that the forensic interviewer had not asked K.W. about any pressures that may have been placed on her before the interview, and that it was "more appropriate" for K.W. to testify in-person to authenticate the video and "identify" the letter.[12]  After the trial court ruled that the video and letter were admissible, Williams did not raise any further objection or argument.  Nor did he raise any other objection when the Commonwealth introduced the video and the letter at trial.  Thus, Williams waived his argument that the forensic interviewer "coached" K.W., tainting the interview, as well as any objection to admission of the letter, because he advances them for the first time on appeal.  *Farnsworth*, 43 Va. App. at 500.  Williams has not invoked the good cause or ends of justice exceptions to Rule 5A:18, and we will not do so sua sponte.  *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc).

## II.  Sufficiency

Williams contends that the evidence was insufficient to sustain his convictions because K.W.'s testimony was inherently incredible as a matter of law.  Williams asserts that K.W.'s testimony was unworthy of belief because K.W. did not immediately report her abuse, the forensic interviewer "pushed her" to say that Williams "compelled her to perform fellatio," and her brothers "took no action" to report her abuse despite their presence during one of the sexual assaults.  We disagree.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to

---

[12] In this case, K.W. testified at trial and Williams had a full opportunity to cross-examine her about the forensic interview as well as the letter.

- 8 -

support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Instead, we ask only 'whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Secret*, 296 Va. at 228). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Id.* (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Such deference stems, in part, from the trial court's "opportunity to observe the testimony and demeanor of all witnesses." *Lopez v. Commonwealth*, 73 Va. App. 70, 81 (2021). Accordingly, settled principles dictate that "[d]etermining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (second alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "[T]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness'[s] testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002) (quoting *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

The record supports the trial court's finding that Williams sexually abused K.W. as she alleged. It is well-settled that "a conviction for rape and other sexual offenses may be sustained solely upon the uncorroborated testimony of the victim." *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005). At trial, K.W. testified that Williams "rubb[ed]" her "butt" several times and forced her to fellate him by grabbing her head and inserting his penis into her mouth. That testimony alone was sufficient to sustain Williams's convictions. *Cf. Alvarez Saucedo v. Commonwealth*, 71 Va. App. 31, 48-49 (2019) (holding ten-year-old victim's testimony that the defendant "touched her vagina with his tongue," "'open[ed]' her vagina," and "lick[ed] around all of [her] vagina" was sufficient to prove oral sodomy (alterations in original)). Consistent with her trial testimony, K.W. told the forensic interviewer that Williams had groped her "behind" and forced her to perform oral sex.

Although K.W. did not immediately report her sexual assault, that circumstance did "not render [her] testimony inherently incredible as a matter of law." *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991). Rather, "[t]he jury was entitled to attribute such significance as it deemed appropriate to this delay." *Id.* At trial, K.W.'s testimony reflected her fear that Williams would be "mad" if she reported him when they lived together, and she did not report her abuse until Williams was incarcerated. That testimony provided the jury with a rational explanation for her delayed disclosure of the abuse. *See id.* (holding the "victim's youth, fright and embarrassment" provided the jury with "an acceptable explanation" for his delayed reporting of sexual abuse); *Woodard v. Commonwealth*, 19 Va. App. 24, 28 (1994) (holding the victim's delay in reporting was "explained by and completely consistent with the all too common circumstances surrounding sexual assault on minors—fear of disbelief by others and threat of further harm from the assailant").

The record does not support Williams's contentions that K.W.'s brothers "took no action" to uncover her sexual abuse or that her account was "coached." First, although K.W. testified that her brothers were present when Williams touched her buttocks, no evidence established that her brothers saw Williams do so or were otherwise aware of the sexual assaults.

Second, the record contains no evidence that Spagnuolo coerced K.W.'s statements during the forensic interview. To the contrary, Spagnuolo testified that she conducted the forensic interview in "neutral" conditions using standardized procedures, had no input in determining the course of Williams's criminal investigation, and noticed that K.W. was unafraid during questioning. And the forensic interview occurred *after* K.W. had written the letter alleging that Williams had sexually touched her and forced her to perform oral sex.

Furthermore, although K.W. was reluctant to testify against Williams at trial, she said that she reported her abuse because she was "tired of holding it in." The jury could have reasonably inferred from that evidence that K.W. disclosed her abuse to the forensic interviewer willingly—even if reluctantly.

In sum, K.W.'s testimony that Williams sexually abused and sodomized her more than once was competent, not inherently incredible, and sufficient to prove beyond a reasonable doubt that he was guilty of forcible sodomy of a child under thirteen while he was over eighteen, two counts of indecent liberties with a child under fifteen, and two counts of aggravated sexual battery. Accordingly, the trial court's judgment was not plainly wrong and we do not disturb it.

### III. Sentencing

Williams assigns error to the trial court "finding a mandatory minimum life sentence was constitutional under [Code] § 18.2-67.1(B)(2)" and "sentencing Mr. Williams to life in prison." While Williams includes a heading in his brief stating a life sentence is "cruel and unusual," he provides no argument or caselaw to support this heading. Instead, Williams focuses on the right

to trial and sentencing by jury, and asks this Court to recommend en banc review of two prior decisions that he asserts create "a discrepancy between Code § 19.2-295, statutes which call for a mandatory minimum sentence, and Va. Const. Art. I, §§ 2 and 8."[13]  Williams also argues that neither the jury nor the victim or her family believed imposition of a mandatory life sentence was just and that therefore the trial court erred in imposing the statutorily required sentence.

Because Rule 5A:20(e) requires that an appellant's opening brief contain the "principles of law, the argument, and the authorities relating to each question presented," *Turner v. Commonwealth*, 68 Va. App. 72, 77 (2017) (quoting *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017)), we find any argument about the mandatory life sentence being cruel and unusual was waived.

Assuming, without deciding, that Williams preserved, through the motion for reconsideration filed after sentencing, his argument that the victim, her family, and the jury believed a mandatory life sentence was unjust, we find no error here.  The jury complied with the sentencing instructions and sentenced the defendant to mandatory life imprisonment on the forcible sodomy conviction and one year on each of the remaining four convictions.  That the jury asked if the sentence could run concurrently does not indicate that they found the sentence inappropriate.  The record also lacks any indication that K.W. and her family's views were disregarded in the sentencing process.[14]  In any event, the jury sentenced Williams to the

_____

[13] The two cases Williams identifies are *Commonwealth v. Greer*, 63 Va. App. 561, 569 (2014) (court "obligated to reject the jury's verdict" beneath the mandatory minimum sentence and must "impanel a new jury to determine punishment within the prescribed limits established by the legislature"), and *Blowe v. Commonwealth*, 72 Va. App. 457, 471-73 (2020) (affirming that a jury may not nullify a mandatory minimum sentence).  We note that Virginia's constitutional protection against cruel and unusual punishment is found in Article I, § 9.

[14] At the sentencing phase before the jury, Francine testified that "this is, honestly, not the outcome we were hoping for" and that the sentence would cause "suffering for my whole family" and "being gone away from his children any longer would be detrimental to our family."

minimum sentence allowable by law, so any error in the sentencing process would be harmless. *See Blowe v. Commonwealth*, 72 Va. App. 457, 471 (2020) ("The fact that the jury set [defendant's] term of incarceration at the minimum allowed by law all but conclusively established that [he] suffered no prejudice" from the error at sentencing.); *see also Nunez v. Commonwealth*, 66 Va. App. 152, 159 (2016) (citing with approval *Holley v. State*, 651 So. 2d 50, 54 (Ala. Crim. App. 1994), finding sentencing error harmless because the defendant received the minimum sentence).

## CONCLUSION

For the above reasons, we affirm the trial court's judgment.

*Affirmed.*

---

K.W. did not testify, and no statement from her was introduced as evidence. To the extent Williams argues that K.W. and her family's rights as victims under Code § 19.2-11.01(A)(4)(d) were violated, those arguments were waived as Williams neither argued at sentencing that a victim impact statement should be introduced nor that the Commonwealth had disregarded any written request of the victim to be consulted on the disposition of the case. *See* Rule 5A:18. The trial court also considered letters from Francine and Williams's children sent directly to the court after the jury imposed its sentence to be ex parte communications and was not asked to consider them at sentencing. Williams has not challenged this ruling on appeal.